## No. 20142.

ELIZABETH O'HERRON, ET AL., *v.* STATE FARM MUTUAL
AUTOMOBILE INSURANCE CO.
(397 P.2d 227)

Decided December 14, 1964.

WILLIAMS and ZOOK, JOHN G. TAUSSIG, JR., ROGER E. STEVENS, WILLIAM A. TRINE, for plaintiff in error Elizabeth O'Herron.

A. JOSEPH WILLIAMS, for defendant in error.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

THE propriety of the entry of a summary judgment is questioned by this writ of error. It was entered in favor of third party defendant and counterclaimant, State Farm Mutual Automobile Insurance Co., on its claim for a declaratory judgment that it is contractually exempt from liability on its policies of insurance issued to Dallas Leroy Dixon and Magdelena Hendrix.

Elizabeth O'Herron, a pedestrian, had been struck by a Hudson automobile driven by Dixon but owned by Mendal Edwards, the operator of a garage in Boulder, Colorado. Mrs. Hendrix is the mother of Dixon, a 16-year-old boy, and they carried policies of automobile insurance issued by State Farm on a Chevrolet automobile owned by Dixon.

Because of injuries sustained, Miss O'Herron sued Dixon, Hendrix and Edwards for damages. Dixon and Hendrix answered, and also filed a third party complaint against State Farm as their insurer who, they averred, should respond for such sums as should be awarded O'Herron. By answer State Farm admitted the issuance of the policies of insurance but denied coverage, and by counterclaim for declaratory judgment alleged that the policies by their terms did not cover Dixon and Hendrix because the accident arose out of the operation of an "automobile business" and because the Hudson was a non-owned vehicle.

O'Herron later withdrew her claim against Edwards. Summary judgment was entered in favor of State Farm on its third party counterclaim on the theory of non-coverage. On the issues joined by the complaint and Dixon's and Hendrix' answer, the jury returned its verdict in favor of O'Herron in the sum of $4000.00, upon which the trial court entered judgment. Appropriate steps were thereafter taken to have this Court review the summary judgment entered in the case.

State Farm had taken the depositions of Edwards and Dixon and their testimony formed the basis for the summary judgment tactic employed by State Farm. To blunt any adverse values that might be placed upon their depositional testimony, Dixon and Edwards filed affidavits in opposition to State Farm's motion for summary judgment. In the form of conclusions they made statements qualifying such testimony regarding the relation between them, the use of the Hudson and the nature of the garage business at the time of the accident.

To understand the contentions of the parties we must look into certain provisions of the policies. By that part of the contract designated "Insuring Agreement I — The Owned Automobile," State Farm undertakes "To pay all damages which the insured shall become legally obligated to pay because of (A) bodily injury sustained by other persons * * * caused by accident arising out of the ownership, maintenance or use, * * * of the owned automobile."

Another part of the contract, designated "Insuring Agreement II — Non-owned Automobiles," reads in part as follows:

"Such insurance as is afforded by this policy * * * with respect to the owned automobile applies to the use of a non-owned automobile by the named insured. . . .

"Insuring Agreement II does not apply:

\* \* \*

"(2) to any accident arising out of the operation of an automobile business."

Appearing in the contract of insurance is a division entitled "Definitions — Insuring Agreements I and II," a part of which is as follows:

"Owned Automobile * * * includes a temporary substitute automobile. . . ."

And a non-owned automobile "means an automobile * * * not owned by the named insured * * * other than a temporary substitute automobile."

An "insured automobile" is defined under the heading, "Definitions — Insuring Agreement III," as meaning "an automobile * * * while temporarily used as a substitute for an insured automobile * * * when withdrawn from normal use because of a breakdown, repair, servicing, loss or destruction. . . ."

The contract of insurance covered a Chevrolet owned by Dixon, but Dixon was driving a Hudson owned by Edwards at the time he collided with O'Herron. Dixon had taken his Chevrolet to Edwards' garage for the installation of an automatic transmission and motor. Ed-

wards had advised Dixon that he could use the Hudson while his Chevrolet was withdrawn from use. At the time of the collision Dixon was on his way to get some grease remover which was to be used on the Chevrolet while it was thus undergoing repair.

Because of the circumstances surrounding the use of the Hudson when the collision occurred, O'Herron and State Farm have resorted to different provisions of the contract of insurance as being applicable, but in reality their discordant contentions, bringing about dissimilar results, arise from divergent views of the testimony contained in the depositions.

O'Herron relies upon the definitions appearing in "Definitions — Insuring Agreements I and II" as they apply to "Insuring Agreement I," covering owned automobiles. She claims that the Hudson was contractually recognized as an owned automobile and, hence, covered by insurance. Her reasoning leads to the conclusion that the Hudson was at the critical time a temporary substitute for the Chevrolet.

Progression of her argument may be briefly detailed. State Farm undertakes, in the first paragraph of "Insuring Agreement I — The Owned Automobile," "to pay all damages * * * caused by accident arising out of the * * * use * * * of the owned automobile." "Owned automobile" is defined in "Definitions — Insuring Agreements I and II" as including "a temporary substitute automobile," that is, "an automobile not owned by the named insured while temporarily used as a substitute for the described automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction."

Continuing, she argues that the Hudson was a temporary substitute and that a temporary substitute by the terms of the contract is an owned automobile; ergo, State Farm should pay all damages caused by the accident arising out of the use of the Hudson automobile.

State Farm asserts that there is no coverage because

"Insuring Agreement II — Non-Owned Automobiles" controls. The insured automobile was the Chevrolet, not Edwards' Hudson. "Such insurance as is afforded * * * with respect to the owned automobile applies to the non-owned automobile. . . ." but it does not extend to an accident "arising out of the operation of an automobile business." A non-owned automobile is one "not owned by the named insured * * * other than a temporary substitute automobile."

It follows, so State Farm argues, that "Insuring Agreement II — Non-Owned Automobiles" imparts "no coverage to an accident involving a non-owned automobile arising out of the operation of an automobile business if the non-owned automobile is not a temporary substitute as defined in the policy." In State Farm's view the Hudson was not a temporary substitute automobile within the terms of the insurance contract.

Accordingly, both parties have posed the visceral question for resolution: Under the facts, could the trial court determine as a matter of law that the Hudson automobile was not at the crucial time a temporary substitute automobile? If it could not, it improperly entered a summary judgment in favor of State Farm.

Concerning the facts upon which the trial court acted, it is observed that the testimony contained in the depositions is in agreement; there is no dispute. Any countering of such testimony resulted from the affidavits, but since there is justifiable doubt cast upon their efficacy by reason of what this Court said in *Norton v. Dartmouth Skis, Inc.*, 147 Colo. 436, 364 P.2d 866, regarding the use of conclusions in affidavits in summary judgment proceedings, we disregard them.

Under their arrangement, Dixon was to use the Edwards' garage to work on his Chevrolet automobile. Edwards was to supply and help install certain parts in the Chevrolet and Edwards was to receive for his undertaking a sum not to exceed $275.00. It was understood

that Dixon would do as much work as he was capable of doing on the car, and Edwards would do the rest.

On Saturday morning Dixon used the Hudson automobile to go home and get $105.00 required by Edwards as a down payment. At the time the Chevrolet could not be driven, since it was already undergoing the repair contracted for.

On the same morning, Edwards and Dixon discussed the matter of cleaning the Chevrolet "so that we wouldn't get so dirty working on the car." It was decided that a "degreaser" should be obtained from "H. & B.," a supplier, so that Dixon could work on the car on the next day, a Sunday. Edwards gave Dixon a check for the degreaser, and Dixon asked, "Take the Hudson?" and Edwards answered, "Yes."

The salient facts, other than those already noted, are:

1. Edwards had given Dixon permission to use the Hudson while the Chevrolet was undergoing repairs.

2. The grease-remover was to be used on the Dixon car on Sunday, but the quantity obtained from "H. & B." would exceed that needed for the Chevrolet.

3. Dixon went to get the grease-remover on Saturday so that he could use it on Sunday rather than wait for it to be delivered the following week.

4. Dixon was not working for Edwards on that Saturday.

5. All work on the Chevrolet would be under the control and supervision of Edwards.

From these facts divergent inferences could be drawn. The fact-finder could infer either that Dixon was running a personal errand for himself in getting the "degreaser" or that he was obtaining it for Edwards for use in the latter's business. Dixon's act in going for the "degreaser" might be viewed in the same light as his act of getting the $105.00 down payment, and that could be a personal mission. The content of the dialogue concerning the matter of getting the "degreaser," and the manner in which it was carried on, could lead to the inference that

it resulted from an order given by Edwards to Dixon, or from a request, in the nature of a favor, from Dixon to Edwards.

These inferences, and others that could be drawn, would lead to variant results depending upon which were the more reasonable. If, in the consideration of this testimony, the fact-finder believed it more compatible with the truth to infer a personal use of the Hudson, it would be a proper sequitur to further find that the Hudson was a temporarily substituted automobile.

█ Our rule and the statute provide for factual determinations in declaratory judgment proceedings. C.R.S. '53, 77-11-9, and Rule 57 (i), R.C.P. Colo., provide:

"When a proceeding under this rule involves the determination of an issue of fact, such issues may be tried and determined in the same manner as issues of fact are tried and determined in other actions in the court in which the proceeding is pending."

█ Factual determinations may be necessary in order to declare rights, status or legal relations. An action for declaratory judgment may be properly maintained by an insurance company to fix liability vel non, "notwithstanding that factual determinations are necessary to make a declaration on the controlling issue." *Ohio Farmers Ind. Co. v. Chames,* 170 Oh. St. 209, 163 N.E.2d 367; *State Farm M. Auto Ins. Co. v. Skluzacek,* 208 Minn. 443, 294 N.W. 413; *Trinity Universal Ins. Co. v. Willrich,* 13 Wash. 2d 263, 124 P.2d 950, 142 A.L.R. 1.

█ That pleadings, depositions, admissions or affidavits contain undisputed matter and can be taken as true is not decisive of the question of whether there is a genuine issue of any material fact. "An issue of fact may arise from countervailing inferences which are permissible from evidence accepted as true." *Cameron v. Vancouver Plywood Corp.,* 266 F.2d 535; *Empire Electronic Co. v. United States,* 311 F.2d 175.

█ Where the undisputed evidence permits of offsetting inferences, the party against whom a motion for

summary judgment is made "is entitled to all favorable inferences which may be reasonably drawn from the evidence and if when so viewed reasonable men might reach different conclusions the motion should be denied." *Caylor v. Virden,* 217 F.2d 739.

■ It is the law of this jurisdiction that the party moving for a summary judgment has the burden of demonstrating "clearly the absence of a genuine issue of fact" in order to prevail. If any doubt resides in the mind of the court after a consideration of the motion, its resolution must be against the motion. *Koon v. Steffes,* 124 Colo. 531, 239 P.2d 310.

■ Since inferences may be drawn from the depositional testimony permitting countervailing results, some of which would be favorable to O'Herron on the issue of the Hudson being a temporary substitute, they should have been viewed in such light. Thus viewed, the motion for summary judgment should have been denied.

Judgment reversed.

MR. JUSTICE PRINGLE concurs in the result.

MR. JUSTICE MOORE and MR. JUSTICE DAY dissent.

MR. JUSTICE PRINGLE concurring in the result:

In my opinion the affidavits filed in opposition to State Farm's motion for summary judgment, however obscurely, do sufficiently raise issues which can be determined only by the trier of the facts. Such being the case, I would hold that the entry of a summary judgment by the trial court in this case was improper and that the summary judgment should be reversed.