HECLA MINING COMPANY, a
Delaware corporation,
Petitioner,

v.

NEW HAMPSHIRE INSURANCE COM-
PANY and Industrial Indemnity
Company, Respondents.

No. 89SC646.

Supreme Court of Colorado,
En Banc.

May 13, 1991.

Rehearing Denied June 10, 1991.

Kelly, Haglund, Garnsey & Kahn, Edwin S. Kahn, Denver, Williams, Trine, Greenstein & Griffin, P.C., Jean E. Dubofsky, Boulder, for petitioner.

Crane & Leake, P.C., Robert E. Crane, James E. Casey, Durango, Buchalter, Nemer, Fields & Younger, Victor C. Rabinowitz, Los Angeles, Cal., for respondent N.H. Ins. Co.

Rothgerber, Appel, Powers & Johnson, Charles Goldberg, Frederick J. Baumann, Mark Spitalnick, JoAnn L. Vogt, Gregory A. Vallin, Denver, for respondent Indus. Indem. Co.

Denis H. Mark, and Berkowitz, Brady & Backus, William J. Brady, Denver, for amicus curiae Colo. Trial Lawyer's Ass'n.

Popham, Haik, Schnobrich & Kaufman, Ltd., Gary E. Parish, Wiley Y. Daniel, Den-

ver, Popham, Haik, Schnobrich & Kaufman, Ltd., John E. Heintz, Lisa I. Latorre, Washington, D.C., for amici curiae American Min. Congress, Colo. Min. Assoc., Newmont Min. Corp., Idarado Min. Co., Homestake Min. Co. and Cyprus Minerals Co.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Jacqueline H. Berardini, Deputy Atty. Gen., James D. Ellman, First Asst. Atty. Gen., Mary Capdeville, Asst. Atty. Gen., Denver, for amicus curiae State of Colo.

Bradley, Campbell, Carney & Madsen, John R. Jacus, Golden, for amicus curiae The Lowry Coalition.

Geoffrey T. Wilson, Denver, Anderson Kill Olick & Oshinsky, P.C., Eugene R. Anderson, Geri L. Weiseman, New York City, for amicus curiae Colo. Mun. League.

White & Steele, P.C., Frederick W. Klann, Denver, for amicus curiae Ins. Environmental Litigation Ass'n.

Justice ERICKSON delivered the Opinion of the Court.

We granted certiorari to review *New Hampshire Insurance Co. v. Hecla Mining Co.*, 791 P.2d 1154 (Colo.App.1989), which held that a comprehensive general liability insurance policy did not require an insurer to defend an action for damages for pollution resulting from the insured's mining activities. We reverse and remand with directions.

In 1983, the state of Colorado (state) filed suit in federal district court under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601, 9607 (1983 & 1990 Supp.), against Asarco, Inc., Resurrection Mining Company, and the Res–Asarco Joint Venture.[1] The state alleged that the defendants were jointly and severally liable under the strict liability provisions of CERCLA, and under common-law negligence theories, for the cleanup costs and other damages resulting from the discharge of heavy metals and other contaminants into California Gulch from the Yak Tunnel.[2] The state filed an amended complaint in April 1985, seeking compensation for the cleanup costs for the entire California Gulch drainage basin system.

The state's CERCLA complaint was initiated after employees of Asarco caused a surge of yellow sedimentary sludge to emit from the Yak Tunnel when shoring timbers and accumulated debris were removed that had impounded the contaminated water.[3] The yellow sedimentary sludge emitted from the Yak Tunnel was a limonitic precipitate, formed by ferric hydroxide and a variety of ferric sulfates, that accumulated on the bottom of the drainage tunnel. The surge of contaminated water turned a twenty-mile stretch of the Arkansas River orange.

In January 1985, Resurrection, Asarco, and Res–Asarco Joint Venture filed a third-party complaint against Hecla Mining Company.[4] The complaint against Hecla seeks

---

**1.** CERCLA creates statutory liability for present and former owners of hazardous waste disposal sites, transporters of hazardous wastes, and those who arrange for the transport and disposal of hazardous waste. 42 U.S.C. § 9607. Under CERCLA, any party with an ownership interest in the site responsible for the release of contaminants can be held strictly liable regardless of fault or intent. *Id.* The liability under CERCLA is joint and several, regardless of each party's degree of fault or responsibility for the creation of the hazardous condition. *Id.*

**2.** The Yak Tunnel is not far from Leadville, and was developed between 1895 and 1923. The tunnel extends four and one-half miles under Iron Hill and Breece Hill in upper California Gulch, and was designed as a portal for the transportation of ore out of adjacent mines and

to allow for drainage of the mine shafts into the California Gulch.

**3.** A "surge" is a sudden release of water that has been impounded in a mine tunnel. A surge is of short duration and generally produces a high flow of water. When a tunnel is properly maintained as part of the ongoing mining operations, surges do not occur, although once maintenance stops, roof rock and timbers collapse, creating debris barriers, impounding water that has seeped into the tunnel. When the hydraulic pressure becomes high enough, the impounded water bursts the debris barrier and a surge results. Flow rates and volumes of a surge are unpredictable.

**4.** Third-party complaints were also filed against over 200 other companies and individuals.

■■■■■■■■■■■■

contribution for alleged discharges into the Yak Tunnel that occurred from 1938 to 1953 when Hecla was a shareholder and had a one-third ownership interest in the Resurrection Mining Company. The Resurrection Mining Company mined gold, silver, and lead ore at the Resurrection mine. Two of Resurrection's mine shafts connect with and drain into the Yak Tunnel. From 1981 to 1985, Hecla also held a lease interest in a mill and several tailings impoundments located in the lower California Gulch.

Industrial Indemnity Company provided a series of comprehensive general liability (CGL) insurance policies covering Hecla from January 1, 1974, through January 1, 1982. New Hampshire Insurance Company provided a series of one year CGL insurance policies for Hecla from January 1, 1980, through January 1, 1985. Hecla requested that both Industrial and New Hampshire provide a defense against the joint venture's third-party complaint. Industrial denied coverage and filed a declaratory judgment action in Denver District Court to obtain a judicial determination of whether it had a duty to defend the third-party claim, and whether it had a duty to indemnify Hecla for any liability resulting from the lawsuit. C.R.C.P. 57; § 13–51–101, 6A C.R.S. (1987). New Hampshire originally agreed to defend Hecla, subject to a reservation of its right to deny coverage. New Hampshire later denied coverage and intervened in the declaratory judgment action brought by Industrial.

■■ The district court entered summary judgment in favor of Hecla, finding that Industrial and New Hampshire had a duty to defend Hecla in the CERCLA action, and that the issue of the duty to indemnify was not ripe for resolution. The court of appeals reversed the district court, holding that Hecla knew or should have known of a substantial probability that its mining activities would result in environmental damage, and therefore the resulting damage

was not an unexpected and unintended occurrence and was thus outside the scope of Hecla's coverage. The court of appeals concluded that neither Industrial, nor New Hampshire, had a duty to defend or to indemnify Hecla for liability resulting from pollution generated by its mining activities. We hold that under the terms of Hecla's CGL policies, both Industrial and New Hampshire have a duty to defend Hecla against the state's CERCLA action. The issue of Industrial's or New Hampshire's duty to indemnify Hecla can only be determined after liability of Hecla has been determined, and is therefore not ripe for resolution at this stage of the proceedings.[5]

## I

The CGL insurance policies issued to Hecla by Industrial and New Hampshire limit defense and liability coverage to property damage caused by an occurrence. The word "occurrence" is defined in Hecla's policies as:

> an accident, including continuous or repeated exposure to conditions, which result in bodily injury or property damage, neither expected nor intended from the standpoint of the insured.

*See* Fire Casualty & Surety Bulletin, Aat–1 (1986) (commenting on CGL coverage forms and interpretations of occurrence and claims-made trigger provisions). Hecla's policies also contain exclusions that limit the scope of coverage as defined in the insuring agreement. The pertinent exclusion at issue here is:

> *This insurance does not apply ... to* bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge,*

---

5. The duty to defend and the duty to indemnify are separate and distinct. *City of Johnstown v. Bankers Standard Ins. Co.,* 877 F.2d 1146, 1148 (2d Cir.1989). Any determination of whether Industrial or New Hampshire have a duty to indemnify Hecla is premature, and should not be made until the underlying claims are resolved. *Id.* at 1153.

dispersal, release or escape *is sudden and accidental ....*

(Emphasis added.) This CGL policy provides defense and liability coverage for damage that results from an unexpected and unintended occurrence, not including damage caused by the discharge of pollution, unless that discharge is sudden and accidental.[6]

Hecla contends that the discharge of heavy metals into California Gulch was neither an expected, nor intended, consequence of its mining activity, and that although the discharge of heavy metals constitutes pollution, the discharge was sudden and accidental. Hecla therefore contends that both Industrial and New Hampshire are liable for defense and indemnification costs associated with the state's CERCLA action.

Industrial and New Hampshire both contend that the contamination of California Gulch was reasonably foreseeable and thus was expected and not an occurrence under the terms of Hecla's policies. Industrial and New Hampshire argue that even if this court determines that the damage was unexpected and unintended, the discharge of pollution was not sudden and accidental and is therefore not covered under the CGL insurance policies.

## A

■ The court of appeals concluded that the damage caused by Hecla's mining operations was not unexpected, and therefore was not an occurrence covered by Hecla's insurance policies. The court of appeals reasons were that:

The results of one's intentional acts cannot be unexpected if they are the ordinary consequences of those acts.

Here, Hecla knew or should have known of a substantial probability that its mining activities would result in environmental damage. The Colorado Mined Land Reclamation Act, § 34–32–101, 14 C.R.S. (1984), expresses the General Assembly's intent to "aid in the protection of wildlife and aquatic resources ... and promote the health, safety, and general

---

**6.** Following the widespread prosecution of CERCLA actions, the standard CGL policy was amended and now provides:

2. **Exclusions.**
This insurance does not apply to:
....
f.(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:
(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;
(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;
(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or
(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:
(i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or
(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.
Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.
As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.
(2) Any loss, cost or expense arising out of any:
(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or any way respond to, or assess the effects of pollutants; or
(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.
Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.
Fire Casualty & Surety Bulletin, F–1, –2 (November 1990).

welfare of the people of this state." Section 34–32–102, 14 C.R.S. (1984)....
Thus, absent a contrary showing, the Act provides constructive notice to all mine operators that their activities could cause environmental damage.

... Accordingly, the damage that occurred was an ordinary consequence of Hecla's actions. As a matter of law, it was not unexpected.

*New Hampshire Ins. Co. v. Hecla Mining Co.*, 791 P.2d at 1157 (citations omitted).

The court of appeals reasoning is in error. The Colorado Mined Land Reclamation Act does not provide notice to all mine operators that mining could cause environmental damage. The court of appeals, in interpreting the Mined Land Act, failed to consider the entire section on which it relied for its holding. Section 34–32–102, 14 C.R.S. (1984), begins:

> It is declared to be the policy of this state that the extraction of minerals and the reclamation of land affected by such extraction are both *necessary and proper activities*. It is further declared to be the policy of this state that *both such activities should be and are compatible*. It is the intent of the general assembly by the enactment of this article to allow for the continued development of the mining industry of this state, while requiring those persons involved in mining operations to reclaim land affected by such operations ....

(Emphasis added.) Contrary to the court of appeals analysis, the Mined Land Act proclaims that mining is a necessary and proper activity, and should be promoted by the state of Colorado.

 Hecla's CGL insurance policies provide that an occurrence is an accident that is neither expected nor intended from the standpoint of the insured. In *City of Johnstown v. Bankers Standard Insurance Co.*, 877 F.2d 1146 (2nd Cir.1989), the Second Circuit held that damages are only intended if the insured knew that they would flow directly and immediately from the insured's intentional act. The Second Circuit said:

> In general, what make injuries or damages expected or intended rather than accidental are the knowledge and intent of the insured. It is not enough that an insured was warned that damages might ensue from its actions, or that, once warned, an insured decided to take a calculated risk and proceed as before. Recovery will be barred only if the insured intended the damages, or if it can be said that the damages were, in a broader sense, "intended" by the insured because the insured knew that the damages would flow directly and immediately from its intentional act ....

*Id.* at 1150 (citations omitted). *See also Brooklyn Law School v. Aetna Casualty & Sur. Co.*, 849 F.2d 788, 789 (2d Cir.1988). We are persuaded by the Second Circuit and hold that the phrase "neither expected nor intended" should be read only to exclude those damages that the insured knew would flow directly and immediately from its intentional act.

 The state's CERCLA complaint contains claims asserting strict liability. The third-party complaint against Helca does not allege that Hecla expected or intended environmental damage to result from its mining operations. There is no allegation and no proof that the damage caused by Hecla was expected or intended. The incident therefore must be deemed an occurrence under the terms of the CGL policies for the purposes of determining the insurers' duty to defend.

### B

Indemnity and New Hampshire contend that even if the discharge is an occurrence covered by the policies, the discharge is subject to the exclusionary clause because it was not a sudden and accidental discharge, but rather occurred continuously for a period of many years. Hecla contends that because the phrase sudden and accidental is ambiguous, it must be construed against the insurance carriers to mean unexpected and unintended.[7]

---

**7.** The definition of occurrence focuses on whether the damage caused by the discharge of

An insurer seeking to avoid its duty to defend an insured bears a heavy burden. *City of Johnstown v. Bankers Standard Ins. Co.*, 877 F.2d at 1149. An insurer's duty to defend arises when the underlying complaint against the insurer alleges any facts that might fall within the coverage of the policy. *Douglass v. Hartford Ins. Co.*, 602 F.2d 934, 937 (10th Cir. 1979). "The actual liability of the insured to the claimant is not the criterion which places upon the insurance company the obligation to defend." Rather, the obligation to defend arises from allegations in the complaint, which if sustained, would impose a liability covered by the policy.[8] *Id.* "[W]here the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim."[9] *City of Willoughby*

*Hills v. Cincinnati Ins. Co.*, 9 Ohio St.3d 177, 459 N.E.2d 555, 558 (1984). Since the duty to defend is broader than the duty to indemnify, the insurer must defend the insured if the pollution could have occurred suddenly and accidentally. Whether coverage is ultimately available under the contract is a question of fact to be decided by the trier of fact. *Reliance Insurance Co. of Ill., v. Martin*, 126 Ill.App.3d 94, 97, 81 Ill.Dec. 587, 590, 467 N.E.2d 287, 290 (1984). *See* Fire Casualty & Surety Bulletin, Aa–1 (1990) (not necessary that all allegations come within scope of coverage).

The appropriate course of action for an insurer who believes that it is under no obligation to defend, is to provide a defense to the insured under a reservation of its rights to seek reimbursement should the facts at trial prove that the incident resulting in liability was not covered by the policy, or to file a declaratory judgment action after the underlying case has been adjudicated.[10] *See Reliance v. Martin*, 126 Ill.

---

pollution was unexpected and unintended, the pollution exclusion clause focuses on whether the discharge of pollution was unexpected and unintended. *Claussen v. Aetna Casualty & Surety Co.*, 259 Ga. 333, 380 S.E.2d 686 (1989).

**8.** *See also Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 276–77, 54 Cal.Rptr.104, 113, 419 P.2d 168, 177 (1966) (insurer obligated to defend insured even assuming application of clause excluding coverage of intentionally caused damage, since the facts alleged in the complaint might have supported a judgment based merely on the negligent conduct of the insured, which is within the coverage of the policy); *Hawaiian Ins. & Guar. Co. v. Blanco*, 72 Haw. 9, ——, 804 P.2d 876, 879–80 (1990) (duty to defend arises whenever pleadings allege facts which potentially might lead to indemnification liability); *Zurich Ins. Co. v. Raymark Indus.*, 118 Ill.2d 23, 51, 112 Ill.Dec. 684, 697, 514 N.E.2d 150, 163 (1987) (although insurer may not ultimately be obligated to indemnify insured, insurer must defend insured if complaint alleges facts which bring the claim within potential indemnity coverage of the policy); *Republic Vanguard Ins. Co. v. Buehl*, 295 Minn. 327, 331, 204 N.W.2d 426, 429–30 (1973) (where the allegations of a complaint state a cause of action within the terms of policy coverage, the insurer must undertake to defend the insured); *Graber v. State Farm Fire & Cas. Co.*, 797 P.2d 214, 217 (Mont.1990) (same); *MacDonald v. Home Ins. Co.*, 97 N.J.Super. 501, ——, 235 A.2d 480, 482 (1967); (same); *Technicon Elecs. Corp. v. American Home Assur. Co.*, 74 N.Y.2d 66, 73, 544 N.Y.S.2d 531, 533, 542

N.E.2d 1048, 1050 (1989) ("when an exclusion clause is relied upon to deny coverage, the insurer has the burden of demonstrating that the 'allegations of the complaint cast that pleading solely and entirely within the policy exclusions, and, further, that the allegations, *in toto*, are subject to no other interpretation'") (emphasis in original) (citation omitted); *Waste Management of Carolinas v. Peerless Ins. Co.*, 315 N.C. 688, 690–93, 340 S.E.2d 374, 377–78 (1986) (insurer's duty to defend is measured by facts alleged in pleadings, and any doubt as to coverage is to be resolved in favor of insured).

**9.** Similarly, where the complaint alleges facts which would "establish a reasonable likelihood that the alleged tortious conduct of [the insured] is excluded from coverage …," the insurer may seek a declaratory judgment to determine the insured's duty to defend. *Troelstrup v. District Court*, 712 P.2d 1010, 1012–13 (Colo.1986); *see also First Nat'l Bank in Bristol v. South Carolina Ins. Co.*, 207 Tenn. 520, 522, 341 S.W.2d 569, 570 (1960) (insurer has no duty to defend where alleged facts fall within policy exclusion to coverage).

**10.** If the trial court were permitted to go beyond the complaint to determine Industrial's and New Hampshire's duty to defend, this would likely place Hecla in the dilemma of establishing in the declaratory judgment action that although it was responsible for the discharge of pollution into the California Gulch, that dis-

App.3d at 97, 81 Ill.Dec. at 590, 467 N.E.2d at 290; *City of Willoughby Hills v. Cincinnati Ins. Co.*, 459 N.E.2d at 558. Determining the duty to defend based on the allegations contained within the complaint comports with the insured's legitimate expectation of a defense, and prevents the insurer from evading coverage by filing a declaratory judgment action when the complaint against the insured is framed in terms of liability coverage contemplated by the insurance policy.[11] *Hartford Ins. Group v. District Court*, 625 P.2d 1013, 1018 (Colo.1981).

■■■■■■■ In order to avoid policy coverage, an insurer must establish that the exemption claimed applies in the particular case, and that the exclusions are not subject to any other reasonable interpretations. *City of Johnstown v. Bankers Standard Ins. Co.*, 877 F.2d at 1149. *See also Koncilja v. Trinity Universal Ins. Co.*, 35 Colo.App. 27, 528 P.2d 939, 941 (1974) (having affirmatively expressed coverage through broad promises, the insurer assumes a duty to define any limitations upon that coverage in clear and explicit terms). The insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy. *Id.* An insurer is not excused from its duty to defend unless there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured. *See Hartford Ins. Group v. District Court*, 625 P.2d 1013, 1018 (Colo.1981); *see also City of Johnstown v. Bankers Standard Ins. Co.*, 877 F.2d at 1149.

■■■■■■■ The determination of a duty to defend in this case depends on the terms in the insurance policy, and the interpretation of those terms based upon the principles of contract interpretation. *Marez v. Dairyland Ins. Co.*, 638 P.2d 286, 288–89 (Colo. 1981); *Benham v. Manufacturers & Wholesalers Indem. Exchange*, 685 P.2d 249, 253 (Colo.App.1984). Hecla's CGL insurance policies do not define the meaning of the phrase "sudden and accidental." The interpretation of the phrase "sudden and accidental" is therefore dependent on whether the phrase is used ambiguously in the context of the policy's exclusionary clause.[12] Ambiguous language must be construed in favor of the insured and against the insurer who drafted the policy.

charge was both sudden and accidental. This defense, the most reasonable and effective in the declaratory judgment action, would unduly compromise Hecla's defense in the CERCLA action where the complaint is based on a strict liability claim.

If the declaratory judgment action were to result in a determination that Hecla's discharge of pollution was neither sudden nor accidental, but was expected and intended, then the state, in the underlying action, need only amend its CERCLA complaint to include intentional discharge and invoke the doctrine of collateral estoppel against Hecla. *Hartford Ins. Group v. District Court*, 625 P.2d 1013, 1016 (Colo.1981). However, if Industrial and New Hampshire provide Hecla with a defense to the state's CERCLA action, and it is there determined that Hecla was not liable, the insurer avoids any judgment liability under its insurance contract. If Hecla had been defended under a reservation of rights and no declaratory judgment had been sought and Hecla was found to be liable to the state under CERCLA, that determination would have had no effect on a subsequent declaratory proceeding brought by Indemnity and New Hampshire seeking reimbursement for defense expenses, since a determination as to strict liability and negligence does not resolve whether the

discharge was sudden and accidental for the purposes of the pollution exclusion. *See Farm Bureau Mut. Auto. Ins. Co. v. Hammer*, 177 F.2d 793, 801 (4th Cir.1949); *Lane v. Hartford Fire Ins. Co.*, 343 F.Supp. 79, 85–86 (E.D.Mo.1972); *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 278, 54 Cal.Rptr. 104, 114, 419 P.2d 168, 178.

The burden imposed on Industrial and New Hampshire by requiring that the duty to defend be determined by the allegations in the complaint are negligible compared with the burden imposed on Hecla in defending a declaratory judgment action which looks to facts beyond the allegations in the complaint. *See Hartford Ins. Group v. District Court*, 625 P.2d at 1017.

11. Requiring the average auto accident victim, or the average home owner to bear the onerous financial burden of proving that they are entitled to a defense from liability claims asserted against them would deny the insured the protection afforded by a liability policy.

12. Some courts have determined that the terms "sudden and accidental" are ambiguous by the mere fact that they are not defined in the insurance policy. *See Buckeye Union Ins. v. Liberty Solvents & Chem.*, 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984).

Northern Ins. Co. of N.Y. v. Ekstrom, 784 P.2d 320, 323 (Colo.1989); Kane v. Royal Ins. Co. of America, 768 P.2d 678, 680 (Colo.1989); Republic Ins. Co. v. Jernigan, 753 P.2d 229, 232 (Colo.1988). Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation. Northern Ins. Co. v. Ekstrom, 784 P.2d at 323.

A majority of the courts addressing the meaning of the phrase "sudden and accidental" as used in CGL insurance policies have determined that the phrase is ambiguous and therefore must be construed against the insurer to mean unexpected and unintended. See Claussen v. Aetna Casualty & Sur. Co., 259 Ga. 333, 380 S.E.2d 686 (1989); United States Fidelity & Guar. v. Specialty Coatings Co., 180 Ill.App.3d 378, 386, 129 Ill.Dec. 306, 311, 535 N.E.2d 1071, 1077 (1989); Upjohn Co. v. New Hampshire Ins. Co., 178 Mich.App. 706, 714, 444 N.W.2d 813, 817 (1989); Broadwell Realty Serv., Inc. v. Fidelity & Casualty Co. of N.Y., 218 N.J.Super. 516, 531–35, 528 A.2d 76, 84–85 (App.Div.1987); Allstate Ins. Co. v. Klock Oil Co., 73 A.D.2d 486, 488, 426 N.Y.S.2d 603, 605 (1980); Kipin Indus., Inc. v. American Universal Ins. Co., 41 Ohio App.3d 228, 231, 535 N.E.2d 334, 338 (1987); United Pac. Ins. Co. v. Van's Westlake Union, Inc., 34 Wash.App. 708, 664 P.2d 1262 (1983); Just v. Land Reclamation, Ltd., 155 Wis.2d 737, 157 Wis.2d 507, 456 N.W.2d 570, 575–76 (1990). Other courts have determined that "sudden and accidental" has a temporal quality and means immediate, unexpected, and unintended. See United States Fidelity & Guar. Co. v. Star Fire Coals, Inc., 856 F.2d 31, 34 (6th Cir.1988); American Motorist Ins. Co. v. General Host Corp., 667 F.Supp. 1423 (D.Kan.1987); Fireman's Fund Ins. Co. v. Ex–Cell–O Corp., 702 F.Supp. 1317, 1326 (E.D.Mich.1988); Outboard Marine Corp. v. Liberty Mutual Ins. Co., 212 Ill.App.3d 231, 156 Ill.Dec. 432, 570 N.E.2d 1154 (1991); Waste Management of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 693, 340 S.E.2d 374, 379 (1986); Lower Paxton Township v. United States Fidelity & Guar. Co., 383 Pa.Super. 558, 566, 557

A.2d 393, 397–99 (1989). See also Great Lakes Container Corp. v. National Union Fire Ins. Co. of Pittsburgh, 727 F.2d 30 (1st Cir.1984) (complaint alleged that pollution was deliberate and continuous); American States Ins. Co. v. Maryland Casualty Co., 587 F.Supp. 1549 (E.D.Mich.1984) (same); Barmet of Indiana, Inc. v. Security Ins. Group, 425 N.E.2d 201 (Ind.App. 1981) (same); Techalloy Co. v. Reliance Ins. Co., 338 Pa.Super. 1, 487 A.2d 820 (1984) (same).

■ When determining the plain and ordinary meaning of words, definitions in a recognized dictionary may be considered. People v. Forgey, 770 P.2d 781, 783 (Colo. 1989). In doing so, we find that a number of recognized dictionaries differ on the meaning of the term "sudden." Webster's Third New International Dictionary 2284 (1986) attaches a number of definitions to "sudden." Webster's first defines "sudden" as "happening without previous notice ... occurring unexpectedly ... not foreseen." Webster's then lists synonyms for "sudden" that include "prompt" and "immediate." Random House Dictionary of the English Language 1900 (2 ed. 1987) defines the word "sudden" in a temporal sense as "happening, coming, made, or done quickly." Black's Law Dictionary 1284 (5th ed.1979) defines "sudden" as "[h]appening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for."

■ In Claussen v. Aetna Casualty & Surety Co., 259 Ga. 333, 335, 380 S.E.2d 686, 688 (1989), the Georgia Supreme Court stated:

Perhaps, the secondary meaning is so common in the vernacular that it is, indeed, difficult to think of "sudden" without a temporal connotation: a sudden flash, a sudden burst of speed, a sudden bang. But, on reflection one realizes that, even in its popular usage, "sudden" does not usually describe the duration of an event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death. Even when used to

describe the onset of an event, the word has an elastic temporal connotation that varies with expectations: Suddenly, it's spring. *See also* Oxford English Dictionary, at 96 (1933) (giving usage examples dating back to 1340, e.g., "She heard a sudden step behind her"; and, "A sudden little river crossed my path As unexpected as a serpent comes.").

Although "sudden" can reasonably be defined to mean abrupt or immediate, it can also reasonably be defined to mean unexpected and unintended. Since the term "sudden" is susceptible to more than one reasonable definition, the term is ambiguous, and we therefore construe the phrase "sudden and accidental" against the insurer to mean unexpected and unintended.[13]

If we were to construe "sudden and accidental" to have a solely temporal connotation, the result would be inconsistent definitions within the CGL policies. In the portion of the policies defining occurrence, accident is defined to include "continuous or repeated exposure to conditions, which result in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." If "sudden" were to be given a temporal connotation of abrupt or immediate, then the phrase "sudden and accidental discharge" would mean: an abrupt or immediate, and continuous or repeated discharge. The phrase "sudden and accidental" thus becomes inherently contradictory and meaningless. *City of Northglenn v. Chevron, U.S.A., Inc.*, 634 F.Supp. 217, 222 (D.Colo.1986); *United States v. Conservation Chem. Co.*, 653 F.Supp. 152, 203–04 (W.D.Mo.1986); *Van's Westlake Union, Inc.*, 34 Wash.App. at 711–15, 664 P.2d at 1265–66.

 Neither the state's CERCLA complaint, nor the third-party complaint contains claims asserting that Hecla expected or intended the discharge of pollutants into the California Gulch as a result of its mining operations.

Hecla's CGL policies extend coverage to a sudden and accidental occurrence. The trial court resolved the duty to defend issue by entering a summary judgment. No allegations were made in either the CERCLA complaint or in the third-party complaint that the damage caused by Hecla's discharge of the contents of the Yak tunnel was either expected or intended. No proof was offered by either Indemnity or New Hampshire, discovery proceedings had not been completed, and the factual issues had not been determined. Accordingly, the trial court did not err in concluding that Indemnity and New Hampshire had the duty to defend Hecla.

We reverse and remand to the court of appeals with directions to reinstate the judgment entered by the trial court against Indemnity and New Hampshire.

MULLARKEY, J., dissents, and ROVIRA, C.J., and KIRSHBAUM, J., join in the dissent.

Justice MULLARKEY dissenting:

I respectfully dissent from the majority's opinion. I do not believe that this is an appropriate case in which to determine the insurers' duties to defend based solely on the allegations of the underlying complaints. Although the insurers filed this declaratory judgment action, this case is before us as a result of Hecla's motion for summary judgment. I would reverse the trial court order granting Hecla's motion for summary judgment because dispositive issues of fact remain to be resolved before a court can decide whether the insurers have duties to defend in this case.

On remand, the trial court would have discretion either to proceed with discovery in the declaratory judgment action and to resolve the issue of the insurers' duties to defend or to hold the declaratory action in abeyance until the underlying claim against

---

**13.** The determination that "sudden and accidental" is an ambiguous phrase is supported by a large amount of conflicting authority. Although the mere existence of conflicting authority does not establish the ambiguity of a contract term, *see Allstate Insurance Co. v.*

*Troelstrup*, 789 P.2d 415 (Colo.1990), "this type of comprehensive debate dispels the insurer's contention that the exclusionary language is clear." *Just v. Land Reclamation, Ltd.*, 456 N.W.2d at 578.

Hecla is resolved. Under the first approach, the trial court could permit the parties to proceed with discovery to develop a more complete factual record which will enable the trial court to determine whether the damages from Hecla's alleged releases constitute an occurrence within the insurance policies and, if so, whether the releases fall within the pollution exclusion clauses of the policies. If, in the alternative, the trial court held the declaratory action in abeyance, I would require that Hecla be provided with a defense to the underlying claim until the underlying claim is resolved. Then the insurers could seek reimbursement for defense costs along with a determination of their duties to defend and to indemnify Hecla.

### I.

I acknowledge that the general rule for determining an insurer's duty to defend requires examining the allegations of the underlying complaint in comparison with the terms of the insurance policy. *See, e.g., Lee v. Aetna Casualty & Surety Co.,* 178 F.2d 750, 751 (2d Cir.1949) ("[I]t is the claim which determines the insurer's duty to defend; and it is irrelevant that the insurer may get information from the insured, or from anyone else, which indicates, or even demonstrates, that the injury is not in fact 'covered.'"); *Travelers Indem. Co. v. Dingwell,* 414 A.2d 220, 227 (Me.1980) (insurer had duty to defend because the complaint "disclose[d] a *potential* for liability within the coverage and contain[ed] no allegation of facts which would necessarily exclude coverage.") (emphasis in original); *Technicon Electronics Corp. v. American Home Assurance Co.,* 74 N.Y.2d 66, 73, 544 N.Y.S.2d 531, 533, 542 N.E.2d 1048, 1050 (1989) ("The duty to defend insureds ... is derived from the allegations of the complaint and the terms of the policy.").

Many cases, however, have held that an insurer's duty to defend is determined based on evidence gained by looking beyond the allegations of the complaint. *See, e.g., American Motorists Ins. Co. v. General Host Corp.,* No. 88–1503, —— F.2d —— (10th Cir. March 21, 1991) (Westlaw 35967) (concluding, based on "extensive findings of fact in [an underlying case] indicating that the pollution at issue ... was intended by defendants," that the pollution was not "accidental" and granting insurer's motion for summary judgment that it did not have a duty to defend or indemnify); *Great Lakes Container Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania,* 727 F.2d 30 (1st Cir. 1984) ("Under New Hampshire law, the complaint and the policy alone may be sufficient for a determination of no coverage. Independent evidence, of course, may be needed if the complaint in the underlying action does not on its face establish lack of coverage.") (citations omitted); *Atlantic Mut. Fire Ins. Co. of Savannah v. Cook,* 619 F.2d 553, 555 (5th Cir.1980) ("[I]n a declaratory action to determine an insurer's duty to defend, the court may take evidence for the purpose of deciding the insurer's duty to defend in this regard, where the facts alleged in the [underlying] petition are sufficient to establish ... liability on the part of the insured but are silent as to the facts or characterization thereof relied upon for a policy exclusion.") (construing Alabama law); *Boyce Thompson Institute for Plant Research, Inc. v. Insurance Co. of N. Am.,* 751 F.Supp. 1137 (S.D.N.Y.1990) (denying summary judgment on the issue of an insurer's duty to defend, despite controlling authority that the duty to defend is determined by allegations of the underlying complaint, because further factual development was warranted to determine whether damage, as alleged in the complaint, occurred while the premises were being used as contemplated by the policy); *American States Ins. Co. v. Maryland Casualty Co.,* 587 F.Supp. 1549, 1553 (E.D.Mich.1984) (declaratory judgment action by insurer where, despite state authority that the duty to defend is determined based on allegations of the complaint, court looked to "subsequent discovery and testimony at trial" to discern the "continuous nature of the insured's dumping" and held that the insurer had no duty to defend or indemnify); *Kepner v. Western Fire Ins. Co.,* 109 Ariz. 329, 509

P.2d 222 (1973) (holding, despite authority for the general proposition that the duty to defend is determined based on the allegations of the complaint, that an insurer had no duty to defend where the underlying claim was covered by the policy based on the facts pleaded in complaint but other facts not appearing in the complaint excluded coverage); *Barmet of Indiana v. Security Ins. Group*, 425 N.E.2d 201 (Ind. Ct.App.1981) (holding, based on factual determinations made by trial court in declaratory judgment proceeding, that insurer had no duty to defend because discharges were not sudden and accidental); *Bituminous Casualty Corp v. Bartlett*, 307 Minn. 72, 240 N.W.2d 310 (1976) (holding, based on deposition which revealed that defective materials were used and construction was contrary to workmanship standards, that insurer had no duty to defend because damages should have been expected by the insured); *Transamerica Ins. Co. v. Sunnes*, 77 Or.App. 136, 711 P.2d 212 (1985) (insurer did not have duty to defend or indemnify in case submitted to the court on parties' stipulation of facts). *See also City of Johnstown v. Bankers Standard Ins.*, 877 F.2d 1146 (2d Cir.1989) ("[W]e hold that the insurers did not meet their burden of showing that they had no duty to defend the City in the CERCLA action. This is so whether that duty is measured against the underlying CERCLA complaint alone *or against the record as a whole.*") (citations omitted) (emphasis added).

Several rationales have been offered for looking beyond the allegations of the underlying complaints to determine whether an insurer has a duty to defend. Two of these rationales are summarized well in *Kepner*, 109 Ariz. at 331, 509 P.2d at 224: (1) under modern pleading rules, the complaint serves a notice function and is framed prior to discovery which crystallizes the facts of the case; and (2) in many cases, proof of alleged facts will not determine the obligation of the insurer under the policy.

Both of these rationales are present in this case. Both the underlying CERCLA complaint and the third-party complaint in this case merely served notice functions. The third-party complaint also was framed prior to discovery, before the third party complainants could know facts that would permit more specific allegations.[1]

Moreover, because the complaint against Hecla merely notified Hecla of a strict liability claim under CERCLA, the complaint's allegations did not need to specify either that Hecla intended or expected to pollute or that alleged releases were not sudden and accidental. As the majority notes, any party with an ownership interest in the site responsible for the release of contaminants can be held strictly liable under CERCLA regardless of fault or intent. *Maj. op.* at 1085, n. 1. *See also* 42 U.S.C. § 9607. Thus, there is no need for the third party to allege facts in its complaint concerning the insured's intent which, if proven, would result in a denial of coverage. It is immaterial for purposes of liability under CERCLA whether pollution damage was unexpected or unintended or whether alleged releases were sudden and accidental.

In addition, third-party complaints were filed against more than 200 other defendants in this case. It is entirely implausible to expect the third-party complainants to have sufficient knowledge to allege the intent of more than 200 defendants and the nature of those defendants' alleged releases. The naming of so many defendants in the third-party complaint in this case, however, is a necessary result of CERCLA. CERCLA is designed to require defendants to seek contribution from the potential myriad of other defendants who also may be held strictly liable for the pollution or contamination at issue. *See* R. Findley & D. Farber, *Environmental Law* 183 (1988) ("[Under CERCLA], joint and several liability is the general rule. The government thus is relieved of the obligation to join all

---

1. I do not believe that a complaint that merely alleged "intentional" or "knowing" discharges, for example, would remove an insurer's duty to defend based on those allegations. Despite such

allegations, an insured might be able to prove that its conduct fell within the terms of the policy, thus creating the insurer's duty to defend.

potentially responsible parties (PRPs) and to prove their individual contributions to the hazardous waste sites. The burden of proving divisibility of harm is on the defendant seeking to limit his liability. In this situation, the subject of contribution among PRPs is of great importance, especially to those against whom the government initially chooses to proceed for recovery of response costs."). This makes the determination of an insurer's duty to defend based on allegations in a third-party complaint seeking contribution under CERCLA particularly inappropriate.

The second rationale from *Kepner* also applies to this case. Because CERCLA is a strict liability statute, proof of the alleged facts required to establish the liability of Hecla will not determine the obligation of the insurers under the policies at issue. It is not necessary for the third-party complainants to establish whether any pollution damage was unexpected or unintended, or whether any alleged releases were sudden and accidental, to establish Hecla's liability. Mere ownership during relevant time periods would suffice to establish liability.[2]

## II.

The facts of this case illustrate the peril of always determining an insurer's duty to defend based solely on the allegations of the complaint. Defense of CERCLA actions can be extremely costly. Thus, Industrial Indemnity took the step of filing a

declaratory judgment action to determine its duty to defend and indemnify and New Hampshire intervened in the action. Rather than proceeding with discovery to determine the two insurers' duties to defend or indemnify, however, Hecla refused to answer interrogatories and produce documents as requested by Industrial Indemnity and New Hampshire, citing the rule that an insurer's duty to defend is determined based on the allegations of the complaint. Hecla's Motion for a Protective Order; Hecla's Opposition to Plaintiff's Motions to Compel and For An Extension of Time.[3] Hecla moved for summary judgment, relying on the same rule. The majority then resolves all questions of coverage in favor of Hecla even though Hecla moved for summary judgment and even though Hecla refused to cooperate with discovery to develop facts revealing whether Hecla's conduct brings the claim within the insurance policies and exclusions in this case. No case has gone so far in precluding an insurer from proving that it had no duty to defend.

## III.

Colorado has approved of the use of declaratory judgment actions brought by the insurer to determine the insurer's duty to defend prior to the trial of the underlying action. *Troelstrup v. Dist. Court*, 712 P.2d 1010 (Colo.1986). In *Troelstrup*, we said:

**2.** The chance that facts determining the insurers' duty to defend would be proved in the underlying CERCLA action is further reduced by various provisions of CERCLA which are designed specifically to encourage settlements. *See, e.g.,* R. Findley & D. Farbes, *Environmental Law* 186 ("[S]ection 122(a) directs that '[w]hen-ever practicable and in the public interest,' settlement agreements should be sought in order to expedite effective remedial actions at superfund sites and to minimize litigation. Section 122(e) includes a new procedural element designed to facilitate agreements among PRPs. It calls for the President to prepare a 'non-binding preliminary allocation of responsibility' (NBAR), allocating percentages of the total response costs at a site among the PRPs, after completion of a 'remedial investigation and feasibility study.' "). The fact that the statute is designed to foster settlements reduces further the chance that a determination of the intent,

expectedness, suddenness or accidental nature of alleged damages or discharges would be determined in the underlying CERCLA case.

**3.** *Cf. Boyce Thompson Inst. for Plant Research, Inc.,* 751 F.Supp. at 1144 ("Coloring our analysis [regarding the denial of insured's motion for summary judgment with respect to the insurer's duty to defend] is the fact that discovery [has not concluded]. Thus, evidence which could resolve these questions [with respect to the insurer's duty to defend] could very well emerge in the near future now that the issues have been focused."). *See also Kepner,* 109 Ariz. 329, 331, 509 P.2d 222, 224 (one rationale for looking beyond the allegations of the complaint to determine an insurer's duty to defend is that "the complaint serves a notice function and is *framed before discovery proceedings crystalize the facts of the case.")* (emphasis added).

It is beyond dispute that an insurance company has the right to seek a declaration of its rights and duties under a policy of insurance.... Resolution of the issue as framed in the declaratory action will result in a determination of [the insurer's] duty to defend [the insured] in the underlying ... action. The existence or nonexistence of this duty "is a proper and sufficient ground for invoking the jurisdiction of the courts under the declaratory judgment act, and presents a justiciable controversy."

*Troelstrup*, 712 P.2d at 1012 (citations omitted). We also have held that it was not an abuse of the trial court's discretion to delay a declaratory judgment action on an insurer's duties to indemnify and defend until after the trial of the underlying action. *Hartford Ins. Group v. Dist. Court*, 625 P.2d 1013, 1018 (Colo.1981).

In both *Troelstrup* and *Hartford Ins. Group*, we emphasized the discretion of the trial court with respect to declaratory judgment actions. *Troelstrup*, 712 P.2d at 1012; *Hartford Ins. Group*, 625 P.2d at 1016. In addition, the trial court in *Hartford Ins. Group*, where we approved of the delay of the declaratory proceeding until after trial of the underlying action, found that the pleadings in the underlying action "clearly indicate[d] a duty to defend." *Hartford Ins. Group*, 625 P.2d at 1016. Conversely, we pointed out in *Troelstrup* that "the nature and character of the alleged facts giving rise to [the complainant's] ... case establish[ed] a reasonable likelihood that the alleged tortious conduct of [the insured] [was] excluded from coverage." *Troelstrup*, 712 P.2d at 1012. Finally, in both cases we compared the prejudice to the respective parties, including the burden on the insured in defending the declaratory action on the issue of coverage and the burden on the insurer in defending the underlying claim. *Troelstrup*, 712 P.2d at 1012–13; *Hartford Ins. Group*, 625 P.2d at 1016–17.

Colorado also has approved of factual determinations in such declaratory judgment actions. Section 13–51–113 of the Declaratory Judgment Act provides as follows:

When a proceeding under this article involves the determination of an issue of fact, such issue may be tried and determined in the same manner as issues of facts are tried and determined in other civil actions in the court in which the proceeding is pending.

*See also Baumgartner v. Schey*, 143 Colo. 373, 378, 353 P.2d 375, 377 (1960) (authorizing trial by jury of disputed questions of fact in declaratory judgment proceedings where "the action in which declaratory relief is sought would have been an action at law had it been permitted to mature without the intervention of declaratory procedure.").[4] Colorado's Declaratory Judgment Act thus contemplates that contracts will be interpreted in light of facts determinable at the time. *Cf. McDonald's Corp. v. Rocky Mountain McDonald's, Inc.*, 42 Colo.App. 143, 145, 590 P.2d 519, 521 (1979) ("Although the Uniform Declaratory Judgments Law and C.R.C.P. 57(c) provide that a contract may be interpreted prior to breach, these provisions are inapplicable where the dispute requires an interpretation in light of extrinsic facts which are *not yet determinable.*") (citation omitted) (emphasis added). Finally, it is settled in Colorado that where a party moves for summary judgment in a declaratory judgment proceeding determining the scope of coverage under an insurance policy, "the party moving for summary judgment has the burden of demonstrating 'clearly the absence of any genuine issue of fact' in order to prevail." *O'Herron v. State Farm Mut. Auto. Ins. Co.*, 156 Colo. 164, 172, 397 P.2d 227, 231 (1964). *See also Boyce Thompson Institute for Plant Research, Inc.*, 751 F.Supp. at 1144 ("[Insured's] motion for summary judgment [with respect to insurer's duty to defend] must be denied as

---

**4.** We also looked beyond the allegations of the complaint to support our approval of the use of the declaratory judgment proceeding prior to the trial of the underlying action in *Troelstrup*.

*Troelstrup*, 712 P.2d at 1012 ("Moreover, the pleadings produced subsequent to the complaint arguably supported [the underlying complainant's] actions.").

premature because a factual question exists which further discovery may resolve.").

## IV.

The cost and duration of declaratory proceedings to determine an insurer's duty to defend can vary greatly. In some cases, the complaint and underlying facts dictate clear results. In other cases, resolution is less clear. The burden and the potential prejudice to the parties in determining the duty to defend before or after resolution of the underlying claim also will vary between cases. Thus, in view of the trial court's substantial discretion with respect to declaratory judgment actions, I would permit the trial court to decide in this case whether currently to proceed with further discovery to find facts necessary to resolve the insurers' duties to defend or to postpone resolution of the declaratory judgment action until after the underlying claim is resolved.

In making such a determination, the trial court can weigh the relative prejudices and burdens on the insured and the insurers. If the trial court finds that resolution of a declaratory judgment action prior to the underlying action would not unduly prejudice the insured, the trial court may order immediate resolution of the declaratory judgment action. On the other hand, if the trial court concludes that litigating the declaratory judgment proceeding prior to the underlying action would overly prejudice the insured, either because of the cost and duration of the litigation, or out of concerns of estoppel in the underlying action, the trial court may postpone resolution of the declaratory judgment action until after the underlying proceeding is resolved.

I also would hold that, in the event the trial court decided to postpone resolution of the declaratory proceeding, the insurers would be required to provide Hecla with a defense of the underlying action but that the insurers may seek reimbursement for their defense costs after the underlying action is resolved.[5] By requiring an insurer to provide the defense (although subject to reimbursement), we ensure that the insured does not bear the burden of providing its own defense. The insured also will not be forced to reimburse the insurer for costs of the defense unless the insurer can prove that the insured's conduct was outside the scope of the policy. This comports with reasonable expectations of both the insured and the insurer. In this case, for example, Hecla could not reasonably expect to be provided with a defense to intentional conduct that clearly falls outside the policy's coverage.

In addition, the burden placed on the insured in defending against a potential claim by the insurer seeking reimbursement for defense costs after the underlying action is much less than the burden on the insured where the insured is required to establish the insurer's duty to defend prior to resolution of the underlying action. The parties will have the benefit of further pleadings, discovery, and, in some cases, trial records and findings, on which they can rely to help determine factual issues relating to the duty to defend. The resources necessary to litigate the issue of the duty to defend after the resolution of the underlying claim may therefore be reduced greatly. It also is likely that, after resolution of the underlying claim, the insured and insurers will be involved in a declaratory judgment action regarding the insurer's duty to indemnify.[6] The issue of the insurer's duty to defend can be resolved in the same declaratory proceeding. Thus, it is much less of a burden on an insured to litigate the issue of an insurer's duty to defend after resolution of the underlying action while simultaneously litigating the issue of the duty to indemnify than it is to litigate the duty to defend

---

5. Because the majority holds in this action that the insurers have a duty to defend, the insurers apparently cannot seek reimbursement for the costs they incur in defending Hecla in the underlying CERCLA action.

6. This most likely will be the situation in the present case. The majority correctly holds that

"[a]ny determination of whether Industrial [Indemnity] or New Hampshire have a duty to indemnify Hecla is premature, and should not be made until the underlying claims are resolved." *Maj. op.* at 1086 n. 5.

issue in a separate action prior to resolution of the underlying action.

### V.

The result reached by the majority can be expected where a court too rigidly adheres to the rule of determining an insurer's duty to defend based on the allegations of the underlying complaint regardless of the type of claim asserted in the underlying complaint, the insured's conduct in the declaratory judgment proceeding, or who moved for summary judgment. In my opinion, however, this result unfairly prejudices the insurers and rewards evasive tactics by the insured. The trial court order granting Hecla's motion for summary judgment should be reversed.

On remand, the trial court can decide, within its discretion, whether to proceed with discovery so the trial court can make the factual findings necessary to decide whether New Hampshire and Industrial Indemnity have a duty to defend, or, in the alternative, to hold the declaratory judgment proceeding with respect to the insurers' duties to defend in abeyance until the underlying claim is resolved. In the latter situation, I would require the insurers to provide Hecla with a defense in the underlying action subject to reimbursement pending resolution of the insurers' duties to defend in a declaratory proceeding following resolution of the underlying claim.[7]

Accordingly, I respectfully dissent.

ROVIRA, C.J., and KIRSHBAUM, J., join in this dissent.

---

**7.** The issue of whether the insurers would be involved in a conflict of interest requiring them to provide independent counsel, possibly of Hecla's choosing, or to obtain Hecla's consent to allow the insurers to conduct the defense is not before us. I would therefore leave this issue to the trial court to resolve.