**COTTER CORPORATION, Petitioner**

v.

**AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY; Great American Insurance Company; American National Fire Insurance Company; American Employers' Insurance Company; Lexington Insurance Company; Granite State Insurance Company; and First State Insurance Company, Respondents.**

No. 02SC707.

Supreme Court of Colorado, En Banc.

May 17, 2004.

As Modified on Denial of Rehearing June 7, 2004.

Moye, Giles, O'Keefe, Vermeire & Gorrell, LLP, John L. Watson, Leonard H. MacPhee, Denver, Colorado, Jenner and Block, LLC, Barry Levenstam, Chicago, Illinois, Joseph Dominguez, Philadelphia, PA, Attorneys for Cotter Corporation.

McGloin, Davenport, Severson & Snow, PC, Michael M. McGloin, Denver, Colorado, Hancock, Rothert & Bunshoft, LLP, William J. Baron, San Francisco, California, Attorneys for Great American Insurance Company and American National Fire Insurance.

Chrisman, Bynum & Johnson, Robert L. Matthews, Boulder, Colorado, Lord, Bissell & Brook, LLP, Michael P. Comiskey, Chicago, Illinois, Attorneys for American Empire Surplus Lines Insurance Company.

Markusson, Green & Jarvis, PC, H. Keith Jarvis, Kirstin G. Lindberg–Smith, Denver, Colorado, Attorneys for American Employers' Insurance Company.

Wood, Ris & Hames, PC, Clayton B. Russell, Denver, Colorado, Sinnot, Dito, Moura & Puebla, PC, J. Karren Baker, San Francisco, California, Attorneys for Lexington Insurance Company and Granite State Insurance Company.

Hogan & Hartson, LLP, Charles T. Mitchell, Coates Lear, Denver, Colorado, George W. Mayo, Jr., Washington, DC, Attorneys for First State Insurance Company.

Beth L. Krulewitch, Denver, Colorado, Attorney for Amicus Curiae Colorado Trial Lawyers Association.

Robert W. Smith, Denver, Colorado, Attorney for Amicus Curiae London Market Insurers.

Springer & Steinberg, PC, JoAnne M. Zboyan, Denver, Colorado, Attorneys for

Amicus Curiae Complex Insurance Claims Litigation Association.

Justice MARTINEZ delivered the Opinion of the Court.

This case arose from a declaratory judgment action initiated by petitioner Cotter Corporation ("Cotter"), a uranium mill operator, against its insurance providers. Cotter seeks a determination that the various insurance policies issued by the respondent insurers required them to both defend Cotter in two tort actions and indemnify Cotter for resulting liability. In response, the insurers contend that the qualified pollution exclusion clauses contained in the policies precluded coverage. In *Cotter Corp. v. American Empire Surplus Lines Insurance Co.*, the court of appeals affirmed the district court's grant of summary judgment in favor of the insurers. 64 P.3d 886 (Colo.App.2002). The court of appeals held that the pollution exclusion clauses did not require the primary insurers to defend Cotter or any of the insurers to indemnify Cotter. Additionally, the court of appeals held that the excess insurance policies did not require the excess insurers to defend Cotter.

We granted certiorari to review the decision of the court of appeals affirming the trial court's grant of summary judgment in favor of the insurers. We specifically examine the court of appeals' interpretation of the qualified pollution exclusion clauses contained in Cotter's policies and its conclusion that the insurers owed no duties to defend or indemnify Cotter.[1] We first conclude that the court of appeals applied the incorrect standard to determine that the qualified pollution exclusion clauses did not require the primary insurers to defend, or any of the insurers to indemnify, Cotter. Contrary to the court of appeals' reasoning, qualified pollution exclusion clauses do not automatically exclude coverage if the insured expected seepage from unlined tailings ponds. We hold that coverage exists if Cotter did not expect and intend contaminants to migrate either off its property or into the groundwater. We conclude that the court of appeals incorrectly affirmed the trial court's grant of summary judgment in favor of the primary insurers with respect to their duty to defend Cotter and in favor of all the insurers with respect to their duty to indemnify Cotter.

Next, we examine the court of appeals' determination that, by the terms of their policies, the excess insurers had no duty to defend Cotter. We hold that the court of appeals' correctly reached this conclusion. Therefore, we affirm the court of appeals' grant of summary judgment in favor of First State Insurance Company and American Empire Surplus Lines Insurance Company on this issue.

I. Facts and Procedural Background

Between 1958 and 1986, Cotter operated a uranium mill near Canon City, Colorado. At the mill, Cotter extracted a crude uranium oxide known as yellowcake from uranium ore. The process of milling and refining uranium produced tailings, a liquid sludge that contained small amounts of uranium, nickel, arsenic, selenium, and molybdenum. These tailings retained roughly eighty-five percent of the radioactivity of the original uranium ore. Until 1983, Cotter treated and stored the tailings in unlined tailings ponds. Cotter later transferred the tailings from the unlined ponds into newly constructed lined ponds.

In 1989, two separate groups of residents of an area near the uranium mill brought two separate tort actions, with similar claims, against Cotter. *See Dodge v. Cotter Corp.*, No. 91–Z–1801 (D. Colo. filed Oct. 24, 1991); *Boughton v. Cotter Corp.*, No. 89–Z–1505 (D. Colo. filed Sept. 1, 1989). The plaintiffs alleged that Cotter's new and old tailings ponds were leaking and, as a result,

---

**1.** Specifically, we granted certiorari on the following issues:

(1) Whether the court of appeals erred in granting summary judgment based on its interpretation of "qualified" pollution exclusion clauses contained in Cotter's insurance policies to preclude coverage for seepage from unlined tailings ponds, when Cotter knew the ponds would leak, but did not believe the leakage would contaminate the environment off-site from its facility.

(2) Whether the court of appeals erred in holding that two of Cotter's excess insurance policies created no duty to defend.

hazardous materials were leaching into the groundwater. The plaintiffs claimed that the releases of hazardous materials caused personal injury and property damage, among other harms.

Cotter filed timely notice of the claims with the Respondent insurance companies (collectively "the insurers"). Relevant to this case, Cotter held primary policies issued by American Employers' Insurance Company ("American Employers' ") and Great American Insurance Company and American National Fire Insurance Company (collectively "Great American"). These primary policies contained provisions promising that the insurers would defend and indemnify Cotter for liabilities under the policies. Cotter also held excess policies with American Empire Surplus Lines Insurance Company ("American Empire"), First State Insurance Company ("First State"), Lexington Insurance Company ("Lexington"), and Granite State Insurance Company ·("Granite State"). These excess policies promised that the insurers would indemnify Cotter for resulting liability, but expressly disclaimed any duty to defend. Citing pollution exclusions in the policies issued to Cotter, all of the insurers refused to defend Cotter in .the *Boughton* and *Dodge* suits or to indemnify Cotter for resulting liability.

A bellwether trial was held in the *Boughton* suit, and eight plaintiffs received a judgment of $79,600 against Cotter. Cotter then entered into a confidential settlement with the remaining plaintiffs. Two trials in the *Dodge* suit resulted in two jury verdicts against Cotter, which the U.S. Court of Appeals for the Tenth Circuit reversed and remanded for new trials. *See Dodge v. Cotter Corp.,* 328 F.3d 1212 (10th Cir.2003).

Cotter filed this declaratory judgment action seeking a determination that the insurance policies issued by the insurers required them both to defend Cotter in the *Boughton* and *Dodge* suits and to indemnify Cotter for any resulting liability.[2] In a series of orders, the district court granted summary judgments in favor of the insurers based on ex-

clusions contained in the policies. The court of appeals affirmed.

First, the court of appeals held that the primary insurers had no duty to defend or indemnify Cotter, and that the excess insurers had no duty to indemnify Cotter, based on the qualified pollution exclusion clauses contained in the insurance policies. The court of appeals concluded that the qualified pollution exclusion clauses excluded coverage because Cotter expected contaminants to seep into the ground beneath the tailings ponds.

Second, the court of appeals held that excess insurers American Empire and First State had no duty to defend Cotter because their excess policies expressly disclaimed any such duty. Thus, the court of appeals concluded that the district court properly granted summary judgments in favor of the insurers.

## II. Standard of Review

██ We begin our analysis by setting forth the appropriate standard of review, as well as general principles for interpreting insurance policies. We review·the court of appeals' decision to affirm the trial court's grant of summary judgment de novo. *West Elk Ranch, L.L.C. v. United States,* 65 P.3d 479, 481 (Colo.2002). Summary judgment is appropriate when the pleadings and supporting documents clearly demonstrate that no issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Id.* A court must afford all favorable inferences that may be drawn from the undisputed facts to the nonmoving party, and must resolve all doubts as to the existence of a triable issue of fact against the moving party. *Id.*

██ When construing the terms of insurance policies, we apply principles of contract interpretation. *Thompson v. Md. Cas. Co.,* 84 P.3d 496, 501 (Colo.2004). As when interpreting contracts, we attempt to carry out the parties' intent and reasonable expectations when they drafted the policies. *Id.*

---

2. Although the *Dodge* litigation is still pending, Cotter and Great American have stipulated that the trial court's orders granting partial summary

judgment based on the qualified pollution exclusion clauses apply to claims arising from both the *Boughton* and *Dodge* cases.

Thus, we seek to give the words in a policy their plain and ordinary meaning, unless the intent of the parties indicates otherwise. *Id.* Where terms in an insurance policy are ambiguous, we construe the terms against the drafter and in favor of providing coverage to the insured. *See id.* at 502. We now apply these principles to interpret the insurance policies before us.

### III. Coverage Under the Qualified Pollution Exclusion Clauses

The court of appeals affirmed the trial court's grants of summary judgment in favor of the insurers, holding that under the qualified pollution exclusion clauses, the primary insurers were not required to defend and none of the insurers were required to indemnify Cotter. The court of appeals reasoned that the clauses excluded coverage because Cotter expected seepage from the ponds. We disagree with this conclusion and hold that coverage exists under the qualified pollution exclusion clauses if Cotter did not expect and intend contaminants to migrate either off its property or into the groundwater. Therefore, we conclude that the court of appeals erred by granting summary judgment in favor of the insurers on these issues. Thus, we remand the issues of whether the primary insurers have a duty to defend, and whether all of the insurers have a duty to indemnify, Cotter.

### A. Qualified Pollution Exclusion Clause Background

Comprehensive general liability insurance policies issued between 1973 and 1985 often included qualified pollution exclusion clauses. Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion,* 75 Cornell L.Rev. 610, 612 (1990). By their terms, these clauses eliminate coverage for damages caused by a discharge or release of contaminants but restore coverage if the discharge or release was unintended. The two qualified pollution exclusion clauses at issue

in this case each contain similar language.[3] The qualified pollution exclusion clauses contained in the policies issued by Great American, Granite State, American Employers', and Lexington state:

> This insurance does not apply:
>
> . . .
>
> to bodily injury or property damage arising out of the discharge, dispersal, release or escape of . . . toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but *this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

Similarly, the qualified pollution exclusion clause contained in the First State policies reads:

> The Insurance does not cover any liability for: . . . Personal Injury or Bodily Injury or loss of, damage to or loss of use of property directly or indirectly caused by seepage, pollution or contamination, provided that always *this clause shall not apply to* liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or destroyed, *where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening* during the period of this insurance.

Through several cases, this court has delineated the scope of qualified pollution exclusion clauses by defining phrases within them. We have primarily analyzed two phrases in the language that restore coverage: the "discharge, dispersal, release, or escape" language and the "sudden and accidental" or "sudden, unintended and unexpected" language.

We have concluded that the phrase "discharge, dispersal, release or escape" refers to the release of pollutants from an area of containment. Specifically, in *Compass In-*

---

**3.** In *Public Service Co. v. Wallis & Cos.,* we referred to the clause in the Great American, Granite State, Lexington, and American Employers' policies as a "standard pollution exclusion clause." 986 P.2d 924, 929–30 n. 4 (Colo.1999).

For clarity, we referred to the clause that now appears in the First State policies as a "London pollution exclusion clause," because it is found in London Market insurance policies. *Id.*

*surance Co. v. City of Littleton*, 984 P.2d 606 (Colo.1999), we held that the initial placement of wastes in an unlined landfill does not necessarily constitute a "discharge, dispersal, release or escape" of pollutants into the environment. *Id.* at 616–18. We reasoned that the phrase does not refer to the initial placement of wastes in an unlined landfill. *Id.* at 617. Rather, we explained that the phrase "carr[ies] the connotation of the issuance of a substance from a state of containment; none of the terms is normally used to describe the placement of a substance into an area of confinement." *Id.* (quoting *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co.*, 126 Wash.2d 50, 882 P.2d 703, 719 (1994)). Therefore, we concluded that a "discharge, dispersal, release or escape"—which we termed "the relevant polluting event" for purposes of qualified pollution exclusion clauses—is the "release of pollutants from a containment area." *Id.* Thus, we have held that qualified pollution exclusion clauses do not preclude coverage for the initial placement of wastes into containment areas.

■ Qualified pollution exclusion clauses only restore coverage for the release of pollutants from areas of containment if the release was "sudden and accidental." We have interpreted the phrase "sudden and accidental" as meaning "unexpected and unintended." *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1091–92 (Colo.1991). Similarly, we have defined "sudden, unintended, and unexpected" as "unprepared for, unintended, and unexpected." *Pub. Serv. Co. v. Wallis & Cos.*, 986 P.2d 924, 933 (Colo.1999). Therefore, qualified pollution exclusion clauses restore coverage for unexpected and unintended releases from contained areas.[4]

### B. The Court of Appeals' Interpretation

The court of appeals relied on our previous interpretations of "sudden and accidental" and "discharge, dispersal, release, or escape" to conclude that the insurers did not owe Cotter duties to defend or indemnify. First, the court of appeals examined our interpretations of "sudden and accidental" and concluded that qualified pollution exclusion clauses

only restore coverage for unexpected and unintended discharges and not for unexpected and unintended damage. Next, the court of appeals determined that Cotter expected a "discharge, dispersal, release, or escape" because it intended that contaminants would filter through the soil beneath the tailings ponds. For these reasons, the court of appeals concluded that the qualified pollution exclusion clauses excluded coverage and thus did not require the primary insurers to defend, or any of the insurers to indemnify, Cotter.

The court of appeals first rejected Cotter's contention that the clauses provided coverage for intended discharges that unintentionally harmed the environment. Cotter had argued that coverage existed under the qualified pollution exclusion clauses if an "unexpected and unintended" harm to the environment had occurred. *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 64 P.3d 886, 889 (Colo. App.2002). Cotter further contended that a "polluting event" was "a discharge that is harmful to the environment." *Id.* Hence, Cotter reasoned, "it must have expected or intended to harm the environment to trigger the pollution exclusion clause and ... any de minimis discharge of contaminants should not be considered a 'polluting event.'" *Id.*

The court of appeals disagreed with Cotter, however, reasoning that "unexpected and unintended" refers to the discharge of pollutants and not to the resulting harm. To reach this conclusion, the court of appeals looked both to our prior interpretations of qualified pollution exclusion clauses and the plain language of the clauses themselves. First, the court of appeals relied on language in *Compass Insurance Co. v. City of Littleton*, in which we characterized the "relevant polluting event" for purposes of qualified pollution exclusion clauses as the "release of pollutants from a containment area." 64 P.3d at 890 (Colo.App.2002) (citing *Compass*, 984 P.2d at 617). Second, the court of appeals pointed to the language of a qualified pollution clause, which stated, "this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental."

4. Amicus curiae London Market Insurers urges this court to revisit our interpretation of "sud-

den" set forth in *Hecla* and *Wallis*. We decline to do so.

*Id.* The court of appeals reasoned that the phrases "sudden and accidental" and "sudden, unintended and unexpected" refer to the discharge of a pollutant and not to the resulting damage. Thus, the court of appeals concluded, "the relevant inquiry is whether the discharge, dispersal, release or escape was expected or intended" and the "relevant polluting event is the intended or expected release of contaminants from a containment area." *Id.*

Having disposed of Cotter's contention that the qualified pollution exclusion clauses restore coverage for unexpected and unintended damage, the court of appeals applied the clauses to determine coverage, looking no further than Cotter's expectation of seepage. It held that the clauses precluded coverage for Cotter because Cotter expected seepage from the ponds into the underlying soil. The court of appeals first cited various statements by Cotter that it intended that contaminants would seep into the soil beneath the ponds. *Cotter,* 64 P.3d at 891. The court of appeals then reasoned that these statements demonstrated that Cotter "intended and expected contaminants to leach from the tailings ponds." *Id.* at 892. Applying the rule that "the relevant polluting event is the release of contaminants from a containment area," the court of appeals concluded that Cotter expected a discharge, dispersal, release, or escape from the tailings pond. *See id.* Therefore, the court of appeals concluded that the qualified pollution exclusion clauses excluded coverage and that neither the primary insurers owed a duty to defend, nor any of the insurers owed a duty to indemnify, Cotter. *Id.*

### C. Interpretation of Qualified Pollution Exclusion Clauses

We first examine the court of appeals' conclusion that qualified pollution exclusion clauses restore coverage only for unexpected and unintended discharges, dispersals, releases, or escapes. We hold that the court of appeals properly rejected Cotter's contention that the clauses restore coverage when dam-

age from a release is unintended and unexpected.

Next, however, we determine the court of appeals prematurely ended its analysis when it concluded that Cotter expected seepage. Contrary to the court of appeals' reasoning, an expectation of seepage is not determinative of whether qualified pollution exclusion clauses preclude coverage. We hold to determine whether coverage exists under qualified pollution exclusion clauses, the key inquiry is whether Cotter expected or intended that contaminants would migrate either off its property or into the groundwater.

### 1. The Discharge/Damage Distinction

■ The court of appeals correctly rejected Cotter's contention that qualified pollution exclusion clauses restore coverage for unexpected and unintended damage. Because the language in the clauses that restores coverage focuses on discharges and does not address damage, we hold that the clauses only restore coverage when discharges are unexpected and unintended.

An examination of the text of an entire qualified pollution exclusion clause reveals that the clauses only restore coverage when discharges are unexpected and unintended. The clauses first specifically exclude all coverage for damages resulting from discharges of contaminants, stating, for example, "This insurance does not apply . . . to bodily injury or property damage arising out of the discharge, dispersal, release or escape [of contaminants]." Then, however, the language that restores coverage does not similarly refer to damages but instead focuses on discharges. For example, one clause specifies that coverage is only restored when a *"discharge, dispersal, release or escape* is sudden and accidental"* (emphasis added). The clauses do not state that they restore coverage for unexpected and unintended damage or harm. Therefore, by their terms, the qualified pollution exclusion clauses only restore coverage when discharges are unexpected and unintended, and not when damages are unexpected and unintended.[5]

---

**5.** Similarly, the other qualified pollution exclusion clause at issue states, "This Insurance does not cover any liability for . . . damage . . . caused by seepage, pollution, or contamination." It restores coverage when pollution results from a *"sudden, unintended and unexpected happen-*

Our case law supports this interpretation. In prior decisions, we have acknowledged that qualified pollution exclusion clauses restore coverage only if the discharge is unexpected and unintended. *See Pub. Serv. Co. v. Wallis & Cos.*, 986 P.2d 924, 926 (Colo. 1999) (holding that when applying the clause, the relevant inquiry is "whether the pollution resulted from a happening that was sudden, unintended and unexpected from the standpoint of the insured"); *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 617 (Colo. 1999) (holding that the relevant pollution event is "the release of pollutants from a containment area").

Moreover, other jurisdictions have similarly interpreted the qualified pollution exclusion clauses as restoring coverage only when discharges are unexpected and unintended. *See St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1203 (1st Cir.1994); *New Castle County v. Hartford Accident & Indem. Co.*, 970 F.2d 1267, 1272 (3d Cir.1992); *Liberty Mut. Ins. Co. v. Triangle Indus.*, 957 F.2d 1153, 1157–58 (4th Cir.1992); *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 662 F.Supp. 71, 75–76 (E.D.Mich.1987), *disagreed with on other grounds by Ray Indus., Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754 (6th Cir.1992); *Morton Int'l, Inc. v. Gen. Accident Ins. Co. of Am.*, 134 N.J. 1, 629 A.2d 831, 847 (1993); *Technicon Elec. Corp. v. Am. Home Assurance Co.*, 74 N.Y.2d 66, 544 N.Y.S.2d 531, 533–34, 542 N.E.2d 1048 (1989); *Transamerica Ins. Co. v. Sunnes*, 77 Or.App. 136, 711 P.2d 212, 214 (1985). These courts also relied on the language of the clauses, reasoning that the clauses only refer to discharges and not damages. *See, e.g., Fireman's Fund*, 662 F.Supp. at 75 (stating that "[a]pplication of the pollution exclusion depends exclusively upon the process by which pollutants entered the environment"); *see also Liberty Mut.*, 957 F.2d at 1157–58; *Transamerica*, 711 P.2d at 214. Under this rationale, courts have declined to extend coverage to insureds that intended to discharge into a specific

area, but did not anticipate that the discharge was hazardous and would contaminate this specific area. For example, courts have held that the clause does not afford coverage to intentional discharges of hazardous substances believed to be at "safe" levels or not hazardous at all. *See, e.g., Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 781 F.Supp. 9, 16–17 (D.D.C.1991); *Anaconda Minerals Co. v. Stoller Chem. Co.*, 773 F.Supp. 1498, 1506 (D.Utah 1991). One court explained that, by the policies' terms, "[s]hould the holy water later turn out to be a witches' brew, ... [the insured] bears the risk of damage from the innocent but intentional act of pollution...." *New Castle*, 970 F.2d at 1272.

We agree with the conclusion of many other courts that, for purposes of qualified pollution exclusion clauses, an insured's expectation of damage is irrelevant and the only necessary inquiry is whether the discharge was unexpected and unintended. Therefore, we hold that the court of appeals correctly interpreted qualified pollution exclusion clauses as restoring coverage when only discharges, dispersals, releases, or escapes are unexpected and unintended.

2. An Expectation of Seepage Compared to an Expectation of Containment

■ Although the court of appeals correctly concluded that qualified pollution exclusion clauses only restore coverage for unexpected and unintended discharges, the court of appeals incorrectly concluded that Cotter expected a discharge of contaminants from its tailings ponds because Cotter expected seepage from the tailings ponds. Despite evidence in the record suggesting that Cotter expected to contain the pollutants by allowing contaminants to filter out in the soil beneath the tailings ponds, the court of appeals viewed Cotter's expectation of seepage as determinative of coverage.

We find this interpretation incompatible with our decision in *Compass Insurance Co.*

---

*ing*" (emphasis added). Like the term "discharge," we have treated the term "happening" as not referring to damage. *See Pub. Serv. Co. v. Wallis & Cos.*, 986 P.2d 924, 933 (Colo.1999) (explaining that under this qualified pollution

exclusion clause, "policy coverage is restored when the pollution *resulted from happenings* that are sudden, unintended and unexpected" (emphasis added)).

*v. City of Littleton,* 984 P.2d 606 (Colo.1999). After a review of *Compass,* we conclude that the application of qualified pollution exclusion clauses does not depend on whether seepage was unexpected and unintended. Instead, as we explained in *Compass,* the inquiry to determine whether qualified pollution exclusion clauses bar coverage focuses on whether the insured expected to fully contain contaminants by filtration when it placed waste materials in the disposal area. In this case, we can simplify this inquiry and merely ask whether Cotter intended or expected contaminants to migrate off its property or into the groundwater.

### a. The *Compass* Decision

Under our holding and reasoning in *Compass,* an expectation of seepage is not determinative of whether qualified pollution exclusion clauses preclude coverage. In *Compass,* we implicitly acknowledged that seepage from unlined landfills is not necessarily a relevant polluting event. First, we explained that in the past, unlined disposal areas often operated with the expectation that the underlying soils would filter contaminants.[6] Second, our holding—that unlined disposal areas constituted containment areas—alone requires us to view seepage from the ponds not as a polluting event but part of a larger containment process. Therefore, we conclude that the court of appeals erred by viewing Cotter's expectation of seepage as determinative of coverage.

Through our reasoning in *Compass,* we viewed seepage from unlined ponds as part of a larger containment process and thus not as a relevant polluting event. In *Compass,* we concluded that the placement of wastes in unlined landfills is not a relevant polluting event because unlined landfills were understood to contain contaminants by filtering them through the underlying soil. *Compass,* 984 P.2d at 616–18. In reaching this conclusion, we agreed with the analysis set forth in *Queen City Farms, Inc. v. Central National Insurance Co.* 126 Wash.2d 50, 882 P.2d 703 (1994). There, the Supreme Court of Wash-

ington considered unlined landfills to be containment areas for purposes of the qualified pollution exclusion clause. *See id.* at 718–19. The court reasoned that unlined landfills were expected to contain pollutants by allowing the soil beneath landfills to filter contaminants before such contaminants reached groundwater. The court explained:

> When landfills began to be licensed in the late 1960s and early 1970s, landfill operators and even many environmental officials expected the design of a landfill would function to contain pollutants. In particular, *the soil beneath landfills was expected to act as a filter to prevent pollutants from migrating into the underlying and surrounding ground and surface waters.*

*Id.* at 719 (quoting *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.,* 480 N.W.2d 368, 373–74 (Minn.Ct.App.1992)). Because unlined landfills were expected to contain contaminants through filtration, we concluded in *Compass,* like the *Queen City Farms* court, that unlined landfills could constitute containment areas for the purpose of qualified pollution exclusion clauses.

Our decision in *Compass* therefore was based on an understanding that unlined disposal areas were expected to contain contaminants by allowing them to filter through the underlying soil before they reached the groundwater. Because we accounted for such seepage when determining that unlined disposal areas constituted containment areas in *Compass,* we interpret this reasoning as implicitly acknowledging that seepage from wastes placed in unlined disposal areas may not constitute a relevant polluting event.

Even though we acknowledged through our reasoning in *Compass* that seepage from wastes placed in unlined disposal areas may not constitute a relevant polluting event, our holding alone in that case compels the same conclusion. Because we held that unlined disposal areas constitute containment areas, and that the placement of wastes in such disposal areas are not relevant polluting events, we cannot now sever the natural and inevitable seepage of contaminants into the

---

**6.** We use the phrase "unlined disposal areas" as generically referring to the two methods of disposal at issue in *Compass* and in this case— unlined landfills and unlined tailings ponds, respectively.

soil beneath disposal areas by classifying seepage as an independent polluting event. Such a classification would suggest that unlined landfills somehow prevented contaminants from seeping into the soil beneath landfills—effectively suggesting that unlined landfills functioned like lined landfills. By characterizing unlined landfills as containment areas, we did not operate under a fiction that topsoil in landfills created an impermeable layer to contain pollutants. Rather, in *Compass*, we viewed the placement of wastes into unlined disposal areas and the natural seepage of wastes not as severable, but rather as part of a larger containment process.

Thus, we view the holding and rationale of *Compass* as acknowledging that seepage from unlined disposal areas does not necessarily constitute a relevant polluting event. For this reason, an expectation of seepage does not establish whether or not qualified pollution exclusion clauses preclude coverage. Therefore, we conclude that the court of appeals erred by holding that the qualified pollution exclusion clauses precluded coverage solely because Cotter expected seepage from the ponds.

### b. Analysis to Determine Whether Qualified Pollution Exclusion Clauses Preclude Coverage

Having established that the court of appeals prematurely ended its inquiry into whether the qualified pollution exclusion clauses preclude coverage, we now explain that, under *Compass*, to decide whether qualified pollution exclusion clauses preclude coverage, we ask whether an insured placed wastes in unlined disposal areas with the expectation contaminants would be fully contained through filtration. We ultimately conclude that to determine whether the clauses preclude coverage in this case, we only must ask whether *Cotter expected or intended* that pollutants migrate into the groundwater or onto neighboring property.

In *Compass*, we explained that an insured's expectation of containment is critical to discerning whether a relevant polluting event occurred. There, we defined a relevant polluting event as the "release of pollutants from a containment area." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 617 (Colo.1999). We then instructed courts to focus on the insured's "intent to discharge pollutants from the containment area" to decide whether a relevant polluting event occurred. *Id.* (citing *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1092 (Colo.1991)). We now conclude from these statements that the necessary inquiry to determine whether a relevant polluting event occurred is whether an insured placed wastes in a disposal area with the expectation that the area would fully contain any contaminants through filtration. If an insured placed wastes in unlined ponds with such an expectation, but contaminants are not contained, a relevant polluting event occurs when contaminants seep beyond the intended containment area.

Here, Cotter advances this very argument, claiming that it expected contaminants to be contained through filtration, but that contaminants seeped outside of the containment area. Although it may be difficult to precisely define the boundaries of the containment area associated with Cotter's unlined ponds, we need not struggle to do so because a relevant polluting event occurred either if contaminants reached neighboring property through soils or if contaminants migrated into the groundwater.

In this case, we conclude a relevant polluting event occurred if the contaminants migrated off Cotter's property, because Cotter's comprehensive general liability policies only provide coverage for damage to another's property. *See* 12 *Couch on Insurance* § 172:26 (Lee R. Russ & Thomas F. Segalla eds., 3d ed.1997). Additionally, the parties do not dispute that a relevant polluting event occurred when contaminants migrated off Cotter's property. Cotter has maintained that it intended to contain contaminants and did not expect or intend their escape off its property. Similarly, the insurers accept Cotter's argument that it placed wastes in containment areas on its property, but contend that Cotter did not intend to fully contain wastes and thus expected the escape of con-

taminants off its property.[7] Consequently, we conclude that a relevant polluting event occurred in this case if the contaminants migrated off Cotter's property.

In addition to concluding that a relevant polluting event occurred if contaminants migrated off Cotter's property, we can also conclude that a relevant polluting event occurred if contaminants reached groundwater. Unlike soils underneath tailings ponds that were understood to trap contaminants, groundwater can never constitute a containment area. Once contaminants reach groundwater, the contaminants will continually migrate. Therefore, because contaminants cannot be contained in groundwater, a relevant polluting event will always occur when contaminants reach groundwater.

For these reasons, we conclude that a relevant polluting event occurred if contaminants migrated either off Cotter's property through the soil or into the groundwater. Thus, to determine whether coverage exists, we look to whether the relevant polluting event was unexpected and unintended. If Cotter placed wastes in the tailings ponds with the expectation contaminants would remain within its property and out of the groundwater, but they in fact migrated off Cotter's property or into the groundwater, then the relevant polluting event was unexpected and unintended. If Cotter placed the wastes in tailings ponds with the expectation that wastes would migrate off its property or into the groundwater, then we can conclude that the relevant polluting events were expected and intended.

Therefore, to decide whether the qualified pollution exclusion clauses preclude coverage, the trial court can simply inquire whether Cotter expected or intended contaminants to migrate off its property or into the groundwater.

### D. Application of the Qualified Pollution Exclusion Clauses

Having concluded that the court of appeals incorrectly interpreted the qualified pollution exclusion clauses and having outlined the correct analysis, we now apply this analysis to determine whether the court of appeals properly affirmed the trial court's grants of summary judgment in favor of the insurers. We ask whether, under the interpretation of qualified pollution exclusion clauses set forth above, the primary insurers have a duty to defend, and all of the insurers have a duty to indemnify, Cotter.

Before we begin to apply this analysis, however, we note that the trial court and court of appeals appeared to collapse the determination of whether the primary insurers had a duty to defend with the determination of whether all of the insurers owed a duty to indemnify Cotter. We instead separately address the determination of these duties, because to address them together would suggest that the insurers can rely on facts developed over the course of litigation to argue that no duty to defend exists.

To determine whether the court of appeals correctly concluded that the primary insurers had a duty to defend Cotter, we look to the complaints from the *Boughton* and *Dodge* litigation. Because the facts alleged in the *Boughton* and *Dodge* complaints may be within the exceptions to the pollution exclusions, we hold that the court of appeals erred by affirming the trial court's grants of summary judgment in favor of the primary insurers with respect to their duty to defend Cotter.

Next, we examine whether the court of appeals properly affirmed the trial court's grants of summary judgment in favor of the insurers with respect to their duty to indemnify Cotter. We determine that because issues of material fact exist as to whether Cotter actually expected to fully contain contaminants through filtration, the court of appeals erred by affirming the trial court's grants of summary judgment in favor of the insurers with respect to their duty to indemnify Cotter.

---

7. We note that neither party has argued that Cotter intended to use neighboring property as part of its containment area. We need not consider here whether coverage could possibly exist in a situation in which a disposer impermissibly uses another's property to contain contaminants. *Cf. Pub. Serv. Co. v. Wallis & Cos.*, 986 P.2d 924, 927–28 (Colo.1999); *Compass*, 984 P.2d at 609–13 (allowing coverage for insured that permissibly disposed of wastes on another's property).

### 1. Primary Insurers' Duty to Defend Cotter

First, we explain that because· the primary insurers refused to defend Cotter, they must rely solely on the allegations contained in the complaint, and not on the ultimate determination of coverage, to establish that no duty to defend existed. Next, we apply this analysis and examine the complaints in the Boughton and Dodge litigation to determine whether the primary insurers had a duty to defend Cotter. We conclude that the facts alleged in the underlying complaints may be within the. exceptions to the pollution exclusions. Therefore, we hold that the court of appeals erred by affirming the trial court's grant of summary judgment in favor of the primary insurers.

### a. General Analysis to Determine an Insurer's Duty to Defend

In this case, the trial court and court of appeals collapsed the determination of the primary insurers' duty to defend with the determination of the insurers' duty to indemnify. As a result, these courts based the determination of the primary insurers' duty to defend on facts revealed over the course of the Boughton and Dodge litigation. The trial court and court of appeals appear to have relied on language in Hecla Mining Co. v. New Hampshire Insurance Co. that suggests that once underlying litigation is resolved, the analysis to determine the duty to defend is the same as to determine the duty to indemnify. 811 P.2d 1083 (Colo.1991). As we explain, however, when an insurer refuses to defend its insured, the determination of the insurer's duty to defend is separate from the determination of the duty to indemnify, and is based solely on factual allegations contained in the underlying complaint.

We have consistently held that an insurer's duty to defend arises solely from the complaint in the underlying action. Thompson v. Md. Cas. Co., 84 P.3d 496, 502 (Colo.2004); Cyprus Amax Minerals Co. v. Lexington Ins. Co., 74 P.3d 294, 299 (Colo.2003); Compass Ins. Co. v. City of Littleton, 984 P.2d 606, 613 (Colo.1999); Constitution Assocs. v. N.H. Ins. Co., 930 P.2d 556, 563 (Colo.1997); Hecla, 811 P.2d at 1089. Therefore, we have described the duty to defend as broader than the duty to indemnify, which depends on the ultimate determination of ·coverage as decided by the trier of fact. Hecla, 811 P.2d at 1089. We have held· that a duty to defend exists when a complaint includes any allegations that, "if sustained, would impose a liability covered by the policy." Id.

In Hecla, however, we noted a circumstance in which courts may· rely on facts outside of the complaint to determine an insurer's obligation to defend. There, we outlined the procedure that an insurer should follow when it believes it has no obligation to defend its insured. We explained that such an insurer should defend but reserve its rights either "to seek reimbursement should the` facts at trial prove that the incident resulting in liability was not covered by the policy, or to file a` declaratory judgment action after the underlying case has been adjudicated." Id. (emphasis added). Therefore, we allowed· insurers that provide a defense to rely on facts outside of the complaint to determine whether they could recover costs of defense from the insured.

Here, the trial court and the court of appeals. appear to have interpreted the language in Hecla as permitting them to collapse the determinations of the duty to defend. and the duty to indemnify because the underlying litigation had concluded. The trial court and court of appeals relied on various statements by Cotter made over the course of the Boughton and Dodge litigation to conclude ` that Cotter expected seepage from the tailings ponds. See Cotter Corp. v. Am. Empire Surplus Lines Ins. Co., 64 P.3d 886, 891–92 (Colo.App. 2002). These courts reasoned that because Cotter expected such seepage, the qualified pollution exclusion clauses excluded coverage and the insurers had no duty to either defend or indemnify Cotter. .

The insurers urge that Hecla sanctions the trial court's result and point to a decision in which the court of appeals interpreted Hecla as allowing an insurer that refuses to defend to rely on the ultimate determination of coverage to defeat such a duty. The court of appeals explained that "an insurer which contracts to defend the insured and fails to do so

runs a calculated risk. If there is an ultimate finding ... of no coverage, the insurer will not be liable for the litigation expenses of its insured since it would have been entitled to reimbursement." *Wheeler v. Reese,* 835 P.2d 572, 577 (Colo.App.1992) (citing *Hecla,* 811 P.2d at 1089).

In *Hecla,* however, we did not attempt to shift the basis for determining the duty to defend upon conclusion of the underlying litigation from the complaint alone to facts outside of the complaint. Rather, in *Hecla,* we addressed a specific situation in which an insurer "believes it is under no obligation to defend." *See Hecla,* 811 P.2d at 1089. We allowed insurers in such a situation to seek reimbursement for defense costs if coverage ultimately did not exist under their policies. *See id.* We attempted to balance the interests of both the insurers and the insureds by ensuring that the broad rule basing the duty to defend on the complaint will not require insurers to pay defense costs if coverage ultimately does not exist under the policies. Additionally, we created an incentive for insurers to defend by allowing them to subsequently seek reimbursement. *See* Stewart McNab, *The Duty to Defend in Colorado After Hecla Mining,* 20 Colo. Law.2095, 2097 (1991). Thus, we did not modify the general determination of the duty to defend, but instead merely attempted to create a remedy for insurers that provided defenses to insureds when coverage ultimately did not exist.

In contrast, when an insurer refuses to defend and the insured brings an action for defense costs after the underlying litigation has been resolved, we apply the general rule that the duty to defend is determined from the factual allegations contained in the complaint. Determining the duty to defend from the face of the complaint in this circumstance serves two purposes: first, it ensures that insurers that refuse to defend do not gain an advantage over insurers that determine their obligations before the underlying litigation concludes and, second, it protects an insured's reasonable expectation of a defense.

We determine the duty to defend on the same basis both before and after the completion of the underlying litigation to ensure that insurers that refuse to defend do not gain an advantage over insurers that establish their obligations before the litigation has completed. When resolving an insurer's obligations in an anticipatory declaratory action brought before the conclusion of the underlying dispute, an insurer's duty to defend is determined from the face of the complaint. *Constitution,* 930 P.2d at 563; *see also Hartford Ins. Group v. Dist. Court,* 625 P.2d 1013, 1016 (Colo.1981) (acknowledging that the trial court found a duty to defend on the basis of the complaint before the underlying litigation was completed but postponing a determination of coverage until the completion of the litigation). Therefore, for insurers that refuse to defend, we similarly base their duty to defend on the face of the complaint. To allow them to use the ultimate determination of coverage to establish that no duty existed would create an advantage over insurers seeking anticipatory declaratory judgments. We do not intend to create an incentive for insurers to refuse to defend in the hope that litigation will reveal that no duty to defend exists.[8] Therefore, to ensure that insurers that refuse to defend face the same duty to defend standard as those that resolve the issue through anticipatory declaratory judgments, we base such insurers' duty to defend on the face of the complaint.

Additionally, basing the determination of the duty to defend on the complaint when an insurer refuses to defend protects the insured's "legitimate expectation of a defense." *Hecla,* 811 P.2d at 1090. By purchasing insurance, the insured reasonably expects that he will not be required to furnish the cost of defending actions that facially fall within the terms of his policy. *Hartford,* 625 P.2d at 1017; *see also Hecla,* 811 P.2d at 1090. Therefore, allowing insurers to refuse to defend, and requiring insureds to seek

8. We note that some safeguards already exist to prevent insurers from refusing to defend when a defense is warranted. Mainly, an insurer risks a suit for refusal to defend if the litigation reveals

that a duty to defend existed. *See Grange Ins. Ass'n v. Hoehne,* 56 P.3d 111, 113–14 (Colo.App. 2002).

reimbursement of defense costs after coverage has been determined, would "defeat the basic reason for the purchase of the insurance." *See Hartford,* 625 P.2d at 1017 (quoting *Gray v. Zurich Ins. Co.,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168, 178 (1966)). Thus, we base the determination of an insurer's duty to defend on the allegations contained in the underlying complaint when such insurer refuses to defend his insured.[9]

In this case, because Cotter's primary insurers refused to defend, the issue of their duty to defend does not hinge on the ultimate determination of coverage. Therefore, the trial court and court of appeals improperly collapsed the duty to defend and duty to indemnify analysis. Instead, to determine whether the primary insurers had a duty to defend Cotter, we look to the allegations contained in the complaints from the *Boughton* and *Dodge* actions.

### b. Primary Insurers' Duty to Defend Cotter

We now consider whether the court of appeals correctly affirmed the trial court's grant of summary judgment in favor of the primary insurers on the issue of their duty to defend Cotter. Specifically, we ask whether, based on the allegations in the *Boughton* and *Dodge* complaints, "no factual or legal basis" exists on which the insurers might be required to indemnify Cotter. We hold that because some allegations in the complaints are within the exception contained in the qualified pollution exclusion clause, the insurers have a duty to defend.

 As we have explained, when insurers refuse to defend their insured and the insured files an action seeking reimbursement, we apply traditional duty to defend analysis to the underlying complaint to determine the insurer's duty to defend. *See, e.g., Thompson v. Md. Cas. Co.,* 84 P.3d 496, 502

(Colo.2004). A duty to defend arises "from allegations in the complaint, which if sustained, would impose a liability covered by the policy." *Hecla Mining Co. v. N.H. Ins. Co.,* 811 P.2d 1083, 1089 (Colo.1991). To defeat a duty to defend, an insurer must establish that "there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured." *See id.* at 1090. Thus, the insurer bears the burden of establishing that "the allegations in the complaint are solely and entirely within the exclusions in the insurance policy" and that any exceptions to the exclusions do not restore coverage. *Compass Ins. Co. v. City of Littleton,* 984 P.2d 606, 618 (Colo.1999) (quoting *Hecla,* 811 P.2d at 1090).

In this case, the allegations in the *Boughton* and *Dodge* complaints are within the pollution exclusion because they allege that contaminants migrated from the tailings ponds off Cotter's property and into the groundwater. However, the complaints also allege facts that are within the exception to the exclusion.

The exception to the exclusion restores coverage if Cotter did not expect and intend the migration of contaminants off its property or into the groundwater. Although the complaints contain allegations that Cotter knew or intended that contaminants would migrate off its property or into the groundwater, the complaints also include allegations for which Cotter could be held liable even if it did not expect and intend contamination. For example, the complaints allege negligence by Cotter that resulted in contamination.[10] Similarly, the complaints include absolute and strict liability actions that do not require a showing of Cotter's intent. *See United States v. Corrow,* 119 F.3d 796, 805 (10th Cir.1997) (noting that for strict liability crimes, proof of intent is not required). Therefore, some of the allegations in the

---

9. For now, we assume this rule applies to bona fide allegations contained in a complaint. We leave open the question whether allegations framed to trigger an insurance policy create a duty to defend. *See Constitution,* 930 P.2d at 563 n. 10.

10. For example, the *Boughton* complaint alleged that Cotter "fail[ed] to properly control and con-

tain the radioactive and/or hazardous materials and constituents and thus ... allow[ed] said radioactive materials and constituents to migrate or leak into the groundwater." The *Dodge* complaint included a similar allegation. Additionally, the complaints alleged that Cotter negligently "fail[ed] to provide adequate containment of the radioactive and/or hazardous materials."

complaints may be within the exception that Cotter did not expect and intend migration of contaminants off its property or into the groundwater.

Because some of the allegations in the *Boughton* and *Dodge* complaints may be within the exception to the exclusion, we cannot conclude that "no factual legal basis" exists on which the insurers could be required to indemnify Cotter. Therefore, we conclude that the insurers have a duty to defend Cotter. For this reason, we hold that the court of appeals erred by affirming summary judgment in favor of the primary insurers with respect to their duty to defend Cotter. Thus, we reverse the court of appeals' judgment affirming the trial court's grants of summary judgment to the primary insurers with respect to the issue of their duty to defend.

### 2. Insurers' Duty to Indemnify Cotter

We now address whether the insurers were entitled to grants of summary judgment on the issue of their duty to indemnify Cotter. Specifically, in light of our interpretation of qualified pollution exclusion clauses, we consider evidence of whether Cotter expected or intended the migration of contaminants off its property or into the groundwater. We find that the record contains conflicting evidence regarding Cotter's expectation and intention that contaminants would migrate off its property or into the groundwater. Therefore, we conclude that issues of material fact exist with respect to Cotter's expectation of containment that do not warrant summary judgment in favor of the insurers.

An insurer's duty to indemnify arises when "the policy actually covers the harm." *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 301 (Colo.2003). The determination of whether a duty to indemnify exists "is largely a question of fact." *Id.* at 301–02.

Initially, in reviewing the trial court and court of appeals' respective reasons for granting and affirming summary judgment in favor of the insurers, we note the inconclusive nature of much of the evidence cited by these courts. Several statements appear to be out of context and seem less determinative when the evidence is viewed as a whole. For example, an expert witness's statement, "the ponds were designed to seep, and that's what happened," by itself ignores her testimony that at the time of their use, tailings ponds were expected to contain contaminants through seepage. *See Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 64 P.3d 886, 891 (Colo.App.2002). Similarly, Cotter's statement, "the very nature of the uranium milling process contemplates migration of certain contaminants off-site from the mill," appears in a response to a request to admit as an objection to the insurers' failure to define "contamination." *See id.* Additionally, this statement may only acknowledge that the milling process creates a risk of off-site migration and does not distinguish uranium tailings from other contaminants generated in the milling process.

Moreover, these statements appear inconclusive when viewed against the amount of overall evidence. The exhibits supporting the motions for summary judgment consist of hundreds of pages of documents and make up only a fraction of the entire record. Thus, we do not view a handful of phrases out of the volumes of record as demonstrating that no issues of material fact exist.

More importantly, the trial court and court of appeals only considered whether Cotter expected seepage from the ponds. As we have explained today, to prevail on their motion for summary judgment, the insurers must establish that the undisputed facts show that contaminants migrated off Cotter's property or into the groundwater, and that Cotter expected or intended such migration. Thus, we now apply the standard articulated above to the facts of this case and evaluate whether the grants of summary judgment in favor of the insurers were warranted.

Although the parties do not dispute that contaminants migrated into the groundwater and off Cotter's property, conflicting evidence exists as to whether Cotter expected or intended this migration. For example, the insurers point to a statement by Cotter that "the very nature of the uranium milling process contemplates migration of certain

contaminants off-site from the mill which is the basis for regulatory monitoring requirements imposed by government agencies...." *Cotter,* 64 P.3d at 891 (alteration in original). Similarly, Cotter has also stated that it may have expected migration of contaminants off its property or into the groundwater in "safe" or "de minimis" levels. This evidence suggests that Cotter expected and intended the migration of contaminants off its property.

Yet evidence also indicates that Cotter did not expect and intend for contaminants to migrate off its property or into the groundwater. Mainly, Cotter points to evidence that it intended to contain contaminants when it placed them in the ponds. Cotter cites evidence that, at the time of their installment, the ponds were viewed as state-of-the art technology to control pollution. For example, passages from the federal publication "Waste Guide for the Uranium Milling Industry" state that general practice in the uranium industry to dispose of tailings was to place them in tailings ponds. A former employee of the state health department similarly testified in the *Dodge* litigation that disposal in tailings ponds was a standard industry practice.

Furthermore, Cotter presents evidence of how the ponds were understood to safely remove contaminants. During the *Boughton* and *Dodge* litigation, experts testified that when wastes were placed in the ponds, liquid waste was expected to evaporate or seep into the ground. Dissolved solids and particles were then expected to be either absorbed by the dirt or precipitate out. Similarly, the federal uranium waste guide boasts that the ponds "can successfully remove substantially all settleable solids," and describes them as a means of preventing water damage. Thus, Cotter proffered evidence that creates an inference that it intended to contain contaminants when it placed them in the ponds, and that any migration off its property and into the groundwater was unexpected and unin-

tended. We find from this evidence that issues of material fact are disputed.

For these reasons, we conclude that the evidence Cotter presents contradicts the insurers' assertion that Cotter expected or intended the migration of contaminants off its property and into the groundwater. Therefore, we hold that issues of material fact exist that preclude summary judgment and that the insurers were not entitled to summary judgment on the issue of their duty to indemnify Cotter.

## IV. Excess Carriers' Duty to Defend

Cotter contends that the court of appeals erred by concluding that the excess policies issued by American Empire and First State [11] do not create a duty to defend. However, we conclude that the court of appeals properly rejected Cotter's argument. The excess policies plainly disclaim any duty to defend, and to read any such duty into the policies would inappropriately interfere with the policies' terms.

American Empire and First State both issued policies that were in excess of primary policies issued by Great American.[12] These excess policies promised to indemnify Cotter but explicitly disclaimed any duty to defend. Both policies contained nearly identical clauses, which stated: "The Company shall not, however, be called upon to assume charge of the settlement or defense of any claim made, or suits brought, or proceedings instituted against the insured."

The court of appeals relied on this express language to conclude that the policies created no duty to defend Cotter. *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.,* 64 P.3d 886, 892 (Colo.App.2002). The court of appeals reasoned that because the policies explicitly disclaimed any duty to defend, they did not impose any such obligation on American Empire and First State. *Id.* (citing *Bertagnolli v. Ass'n of Trial Lawyers Assurance,* 934 P.2d 916, 918 (Colo.App.1997)).

---

**11.** Cotter also holds excess policies issued by Lexington and Granite State. These policies, like the American Empire and First State policies, disclaim any duty to defend. However, Cotter has not appealed the trial court's ruling on those policies with respect to this issue.

**12.** The First State policy was also in excess of a first excess policy issued by Lexington.

The court of appeals rejected Cotter's two arguments that American Empire and First State owed it a duty to defend because the disclaimers in the policies operated like "other insurance" clauses and that they were independently liable under the theory of equitable subrogation.

Despite the disclaimers contained in the excess policies, Cotter appeals the court of appeals' determination that the American Empire, and First State policies did not create a duty to defend. Cotter advances the same two arguments to this court that the court of appeals rejected. First, Cotter argues that the disclaimer provisions in the excess policies conflict with terms in its primary policies and leave Cotter without a defense. Cotter analogizes this situation to conflicting "other insurance" clauses and contends that, as with conflicting "other insurance" clauses, the excess insurers must share in defense costs. Second, Cotter argues that because all primary and excess insurers have refused to defend, the principle of equitable subrogation requires all the insurers to share the costs of defense. We address each argument separately and explain that each fails. We then conclude that the court of appeals correctly applied the plain language of the policy.

### A. Cotter's "Other Insurance" Argument

■ Cotter first contends that the disclaimers contained in the excess policies conflict with language in the Great American primary policies. Cotter points to language contained in the primary policies stating that once the policy limits are exhausted, Great American's obligation to provide a defense ceases.[13] Cotter argues that this language conflicts with the clauses in the excess policies that disclaimed any duty to defend, because to read both clauses together would leave Cotter without a defense.

Cotter analogizes this situation to that in which an insured owns two insurance policies, each of which contain competing "other insurance" clauses. An "other insurance" clause requires that when any other insurance covers the same loss, the other insurance must be exhausted before liability under the policy in question attaches.[14] *Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 764 P.2d 1191, 1199 (Colo.1988). Thus, when two policies contain "other insurance" clauses that cover the same loss, by the terms of the agreements, no insurance would be available. *See id.* Rather than validating one policy at the expense of another, we have held that conflicting "other insurance" clauses are mutually repugnant. *See id.; Guaranty Nat'l Ins. Co. v. Ohio Cas. Ins. Co.*, 40 Colo.App. 494, 580 P.2d 41 (1978), *rev'd on other grounds*, 197 Colo. 264, 592 P.2d 397 (1979). We have instead required both insurers to provide coverage on a pro-rata basis. *See Empire Cas.*, 764 P.2d at 1199–1200; *Allstate Ins. Co. v. Frank B. Hall & Co.*, 770 P.2d 1342, 1347 (Colo.App.1989). Cotter argues that its situation is similar, because the clause in the primary policies, read with the disclaimers in the excess policies, would abrogate all coverage. Therefore, Cotter reasons, the excess insurers are liable for pro-rata shares of defense costs.

As the court of appeals correctly concluded, Cotter's situation is not analogous to the situation of conflicting "other insurance" clauses.[15] In the "other insurance" situation, the insured would have coverage under one policy but for the existence of the other.

---

**13.** Specifically, the policies state: "[T]he company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."

**14.** For example, an "other insurance" clause states: "If There Is Other Insurance . . . If an insured person is using a substitute auto or non-owned auto, our liability insurance will be excess over other collectible insurance." *Avis Rent–A–Car Sys., Inc. v. Allstate Ins. Co.*, 937 P.2d 802, 806 (Colo.App.1996).

**15.** We note that by addressing Cotter's attempt to analogize to "other insurance" clauses, we do not indicate whether "other insurance" disputes can arise between insurers providing different levels of coverage. *See Dart Indus. v. Commercial Union Ins. Co.*, 28 Cal.4th 1059, 124 Cal. Rptr.2d 142, 52 P.3d 79, 92 n. 6 (2002) (noting that "other insurance" clauses only become relevant when insurers provide the same level of coverage and that, thus, disputes cannot arise between primary and excess insurers).

Here, however, Cotter's primary and excess policies do not cover the same loss. Whereas coverage under the primary policies provides Cotter a defense, the excess policies unconditionally exclude any duty to defend. Therefore, neither the primary nor the excess policies would provide Cotter coverage for defense costs above the limits of the primary policies, independent of one another. As a result, we find Cotter's situation different from that of "other insurance" clauses.

Because Cotter's situation is not analogous to that of "other insurance" clauses, First State and American Empire are not liable for defense costs under this theory. Therefore, we conclude that the court of appeals correctly rejected this argument.

## B. Cotter's Equitable Subrogation Argument

■ Cotter also contends that because all excess insurers have refused to defend, principles of equity require the excess insurers to share the defense costs. Specifically, Cotter argues that the theory of equitable subrogation requires the insurers to provide a pro-rata share of the defense costs. We find Cotter's reliance on the doctrine of equitable subrogation misplaced.

To support its contention that the doctrine of equitable subrogation requires American Empire and First State to provide defense costs, Cotter relies on a series of cases in which courts have applied the doctrine to require that insurers share defense costs. See, e.g., Millers' Mut. Ins. Ass'n v. Iowa Nat'l Mut. Ins. Co., 618 F.Supp. 301 (D.Colo. 1985); Cont'l Cas. Co. v. Zurich Ins. Co., 57 Cal.2d 27, 17 Cal.Rptr. 12, 366 P.2d 455 (1961). Cotter argues that "[u]nder general principles of equitable subrogation ... all obligated carriers who have refused to defend should be required to share in costs of the insured's defense." Millers' Mut., 618 F.Supp. at 305 (quoting Cont'l Cas., 17 Cal. Rptr. 12, 366 P.2d at 461). Therefore, Cotter contends, because all of its insurers have refused to defend, the doctrine of equitable subrogation requires First State and American Empire to share in Cotters defense costs.

■ Cotter, however, misstates the doctrine of equitable subrogation. The doctrine does not allow Cotter to recover from American Empire and First State for two reasons. First, the doctrine does not provide a remedy to a party seeking to recover its own expenses. Second, the doctrine only allows for recovery against obligated parties.

■ Subrogation is defined as "the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt." Behlen Mfg. Co. v. First Nat'l Bank of Englewood, 28 Colo.App. 300, 472 P.2d 703, 707 (1970) (quoting D.W. Jaquays & Co. v. First Sec. Bank, 101 Ariz. 301, 419 P.2d 85, 88 (1966)). Although subrogation can occur by contract, equitable subrogation is an equitable principle that allows "a party secondarily liable who has paid the debt of the party who is primarily liable [to] institute a recovery action in order to be made whole." Mid–Century Ins. Co. v. Travelers Indem. Co., 982 P.2d 310, 315 (Colo.1999) (citing 16 George J. Couch, Cyclopedia of Insurance Law § 61:20 (Mark S. Rhodes ed., 2d ed.1983)).

■ In the insurance context, courts generally apply the doctrine of equitable subrogation to allow an insurer, who has made payment to its insured for a loss caused by a third party, to seek recovery from the third party for such payment. See, e.g., United Sec. Ins. Co. v. Sciarrota, 885 P.2d 273, 277 (Colo.App.1994). This prevents the insured from being unjustly enriched by recovering from the insurer as well as the third party, and prevents the third party from escaping its liability for the loss. Id.

First, by definition, Cotter may not rely on the doctrine of equitable subrogation because it has not discharged the debt of another and is not attempting to recover from a third party. Equitable subrogation only allows a party who has paid the debt of another to recover from a liable third party. Behlen Mfg. Co., 472 P.2d at 707; see also 73 Am. Jur.2d Subrogation § 1 (2001); cf. Millers' Mut., 618 F.Supp. at 305–07 (applying doctrine of equitable subrogation to grant excess insurer right of contribution for defense costs from other excess insurer in anticipatory de-

claratory judgment action). For this reason, insurers that have paid an insured's claim often rely on the doctrine to recover from other obligated parties. *See, e.g., Blue Cross v. Bukulmez,* 736 P.2d 834 (Colo.1987) (applying doctrine of equitable subrogation to find that insurer had right to recover benefits paid to insured from obligated third party); *see also United Sec.,* 885 P.2d at 273. Cotter, as the insured, has not discharged the debt of another and does not seek payment from a liable third party. Therefore, Cotter cannot rely on the doctrine of equitable subrogation to recover defense costs.

■ Rather, Cotter merely seeks repayment of its own defense costs from First State and American Empire. Although Cotter terms this recovery as equitable subrogation, Cotter appears to simply seek reimbursement of defense costs. Though "similar in effect;" equitable subrogation and reimbursement allow recovery for parties in two very different positions. *A. Copeland Enters., Inc. v. Slidell Mem'l Hosp.,* 657 So.2d 1292, 1298–99 (La.1995); *see also* 16 *Couch on Insurance* § 222:22 (Lee R. Russ & Thomas F. Segalla eds., 3d ed.1997) (noting distinction between subrogation and reimbursement). Subrogation allows a party who discharges another's debt to "stand in the shoes" of the subrogor. *A. Copeland Enters.,* 657 So.2d at 1298–99. In contrast, reimbursement allows a party to recover amounts expended from another with whom it has a direct right of repayment. *Id.;* 16 *Couch on Insurance* § 222:22 (Lee R. Russ & Thomas F. Segalla eds., 3d ed.1997). Here, Cotter appears to seek reimbursement because it attempts to recover its own defense costs directly from First State and American Empire, with whom Cotter has a direct contractual relationship. Cotter does not seek recovery for its payment of another's debt from a liable third party. Therefore, the doctrine of equitable subrogation does not permit Cotter to recover from the insurers.

■ Second, even if Cotter could rely on the doctrine of equitable subrogation, it could not recover defense costs from First State and American Empire because the insurance policies impose no duty to defend. The doc-

trine of equitable subrogation only permits recovery from other parties liable to the subrogor. *See Mid–Century Ins. Co. v. Travelers Indem. Co.,* 982 P.2d 310, 315 (Colo.1999); *Millers' Mut. Ins. Ass'n of Ill. v. Iowa Nat'l Mut. Ins. Co.,* 618 F.Supp. 301, 305–06 (D.Colo.1985). By definition, when a subrogee discharges the debt of the subrogor and "steps into its shoes," the subrogee does not acquire greater rights than the latter. *Wright v. Estate of Valley,* 827 P.2d 579, 582 (Colo.App.1992). Therefore, for example, in the insurance context, an insurer can only recover from a third party an amount that the insured could have recovered from the third party.

Here, however, a subrogee could not recover defense costs from First State and American Empire because their policies do not obligate them to defend Cotter. The American Empire and First State policies expressly disclaim any duty to defend. Therefore, even if Cotter was in a position to rely on equitable subrogation, it could not recover from American Empire and First State because they owe no duty to defend. Thus, we find Cotter's reliance on the doctrine of equitable subrogation misplaced.

### C. Plain Language of Policy

■ Because Cotter's "other insurance" clause and equitable subrogation arguments fail, we conclude that the court of appeals correctly applied the language of the excess policies to conclude that First State and American Empire did not have a duty to defend Cotter. Where terms of an insurance policy are unambiguous, we enforce the terms as written. *State Farm Mut. Auto. Ins. Co. v. Stein,* 940 P.2d 384, 387 (Colo. 1997). Specifically, when a policy's plain terms unconditionally exclude a duty to defend, we will not find such a duty. *Bertagnolli v. Ass'n of Trial Lawyers Assurance,* 934 P.2d 916, 918 (Colo.App.1997). Here, the policies' plain terms expressly state that First State and American Empire have no duty to defend Cotter. Therefore, we hold that the excess insurance policies issued by First State and American Empire do not impose a duty to defend Cotter.

## V. Conclusion

Accordingly, we reverse the judgment of the court of appeals affirming the trial court's grants of summary judgment in favor of the primary insurers with respect to their duty to defend Cotter because the alleged facts do not warrant summary judgment. Further, we reverse the judgment of the court of appeals affirming the trial court's grants of summary judgment in favor of the insurers with respect to their duty to indemnify Cotter because issues of material fact exist. Finally, we affirm the judgment of the court of appeals affirming the trial court's grants of summary judgment in favor of the excess insurers with respect to their duty to defend Cotter. We remand this case to the court of appeals with instructions that it return the case to the district court for proceedings consistent with this opinion.